**Connell Foley LLP**
One Newark Center
1085 Raymond Boulevard, Nineteenth Floor
Newark, New Jersey 07102
(973) 436-5800
Attorneys for Plaintiff, Baymont Franchise Systems, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAYMONT FRANCHISE SYSTEMS, INC., a Delaware Corporation, | Civil Action No. 20- |
| Plaintiff, | **COMPLAINT** |
| v. | |
| JIGNA, LLC, a New Hampshire Limited Liability Company; and HARISH PATEL, an individual, | |
| Defendants. | |

Plaintiff Baymont Franchise Systems, Inc., by its attorneys, Connell Foley LLP, complaining of defendants Jigna, LLC and Harish Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Baymont Franchise Systems, Inc. ("BFS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Jigna, LLC ("Jigna"), on information and belief, is a limited liability company organized and existing under the laws of the State of New Hampshire, with its principal place of business at 45 Airport Road, West Lebanon, New Hampshire 03784.

BFS 18084
5500712-1

3.      Defendant Harish Patel ("H. Patel"), on information and belief, is a member of Jigna and a citizen of the State of New Hampshire, having an address at 45 Airport Road, West Lebanon, New Hampshire 03784.

4.      Upon information and belief, H. Patel is the only constituent member of Jigna.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and both defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.      This Court has personal jurisdiction over Jigna by virtue of, among other things, section 17.6.3 of the July 6, 2006 franchise agreement by and between Jigna and BFS (the "Franchise Agreement"), described in more detail below, pursuant to which Jigna has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7.      This Court has personal jurisdiction over H. Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which H. Patel acknowledged that he was personally bound by section 17 of the Franchise Agreement.

8.      Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Jigna of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

9.      On or about July 6, 2006, BFS entered into the Franchise Agreement with Jigna for the operation of a 56-room[1] Baymont® guest lodging facility located at 45 Airport Road, West Lebanon, New Hampshire 03784, designated as Site No. 18084-80783-01 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

10.     On or about April 4, 2015, BFS and Jigna entered into a SynXis Subscription Agreement (the "SynXis Agreement") which governed Jigna's access to and use of certain computer programs, applications, features, and services, as well as any and all modifications, corrections, updates, and enhancements to same.   A true copy of the SynXis Agreement is attached hereto as Exhibit C.

11.     Pursuant to section 5 of the Franchise Agreement, Jigna was obligated to operate a Baymont® guest lodging facility for a twenty-year term.

12.     Pursuant to section 7, section 18.5, and Schedule C of the Franchise Agreement, and section 5 of the SynXis Agreement, Jigna was required to make certain periodic payments to BFS for royalties, marketing fees, system assessments, SynXis fees, taxes, interest, and other fees (collectively, "Recurring Fees").

13.     Pursuant to section 7.3 of the Franchise Agreement, Jigna agreed that interest is payable "on any past due amount payable to [BFS] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

---

[1] By letter dated December 29, 2006, a true copy of which is attached hereto as Exhibit B, the parties amended Schedule B of the Franchise Agreement to reflect that the number of rooms at the Facility had decreased from 56 rooms to 55 rooms.

14.     Pursuant to section 3.8 of the Franchise Agreement, Jigna was required to disclose to BFS, among other things, the amount of gross room revenue earned by Jigna at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to BFS.

15.     Pursuant to section 3.8 of the Franchise Agreement, Jigna agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Jigna agreed to allow BFS to examine, audit, and make copies of the entries in these books, records, and accounts.

16.     Pursuant to section 11.2 of the Franchise Agreement, BFS could terminate the Franchise Agreement, with notice to Jigna, if Jigna (a) discontinued operating the Facility as a Baymont® guest lodging establishment, and/or (b) lost possession or the right to possession of the Facility.

17.     Pursuant to sections 12.1 and 18.4 of the Franchise Agreement, Jigna agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to BFS in accordance with a formula specified in the Franchise Agreement.

18.     Section 18.4 of the Franchise Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room of the Facility Jigna was authorized to operate at the time of termination.

19.     Pursuant to section 17.4 of the Franchise Agreement, Jigna agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

5500712-1

20.    Effective as of the date of the Franchise Agreement, H. Patel provided BFS with a Guaranty of Jigna's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit D.

21.    Pursuant to the terms of the Guaranty, H. Patel agreed, among other things, that upon a default under the Franchise Agreement, he would "immediately make each payment and perform or cause [Jigna] to perform, each unpaid or unperformed obligation of [Jigna] under the [Franchise] Agreement."

22.    Pursuant to the terms of the Guaranty, H. Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by BFS in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Termination of the Franchise Agreement

23.    On or about November 25, 2019, Jigna ceased operating the Facility as a Baymont® guest lodging facility thereby unilaterally terminating the Franchise Agreement.

24.    By letter dated December 20, 2019, a true copy of which is attached as Exhibit E, BFS acknowledged Jigna's unilateral termination of the Franchise Agreement, effective November 25, 2019, and advised Jigna that it was required to pay to BFS as liquidated damages for premature termination the sum of $55,000.00 as required under the Franchise Agreement, and all outstanding Recurring Fees through the date of termination.

5500712-1

## FIRST COUNT

25.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 24 of the Complaint.

26.    Pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Jigna agreed to allow BFS to examine, audit, and make copies of Jigna's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

27.    The calculation of the monetary amounts sought by BFS in this action is based on the gross room revenue information supplied to BFS by Jigna and, to the extent there has been non-reporting, BFS's estimate as to the gross room revenue earned by Jigna.

28.    The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements, and books from Jigna.

**WHEREFORE**, BFS demands judgment ordering that Jigna account to BFS for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

29.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 28 of the Complaint.

30.    On or about November 25, 2019, Jigna ceased operating the Facility as a Baymont® guest lodging facility thereby unilaterally terminating the Franchise Agreement.

31.    By letter dated December 20, 2019, BFS acknowledged Jigna's unilateral termination of the Franchise Agreement, effective November 25, 2019.

5500712-1

32.     Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Jigna shall pay liquidated damages to BFS within 30 days of termination.

33.     As a result of the termination of the Franchise Agreement, Jigna is obligated to pay BFS liquidated damages in the amount of $55,000.00 as calculated pursuant to sections 12.1 and 18.4 of the Franchise Agreement.

34.     Notwithstanding BFS's demand for payment, Jigna has failed to pay BFS the liquidated damages as required in sections 12.1 and 18.4 of the Franchise Agreement.

35.     BFS has been damaged by Jigna's failure to pay liquidated damages.

**WHEREFORE**, BFS demands judgment against Jigna for liquidated damages in the amount of $55,000.00, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

36.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37.     By virtue of the premature termination of the Franchise Agreement, BFS sustained a loss of future revenue over the remainder of the twenty-year term of the Franchise Agreement.

38.     If the Court determines that Jigna is not liable to pay BFS liquidated damages as required by sections 12.1 and 18.4 of the Franchise Agreement then, in the alternative, Jigna is liable to BFS for actual damages for the premature termination of the Franchise Agreement.

39.     BFS has been damaged by Jigna's breach of its obligation to operate a Baymont® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, BFS demands judgment against Jigna for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

40.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.    Pursuant to section 7, section 18.5, and Schedule C of the Franchise Agreement, and section 5 of the SynXis Agreement, Jigna was obligated to remit Recurring Fees to BFS.

42.    Despite its obligation to do so, Jigna failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $71,919.18.

43.    Jigna's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged BFS.

**WHEREFORE**, BFS demands judgment against Jigna for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $71,919.18, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

44.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.    At the time of the termination of the Franchise Agreement, Jigna was obligated to pay BFS Recurring Fees.

46.    Despite its obligation to do so, Jigna failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $71,919.18.

47.    Jigna's failure to compensate BFS constitutes unjust enrichment and has damaged BFS.

**WHEREFORE**, BFS demands judgment against Jigna for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $71,919.18, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

48.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.    Pursuant to the terms of the Guaranty, H. Patel agreed, among other things, that upon a default under the Franchise Agreement, he would immediately make each payment and perform each obligation required of Jigna under the Franchise Agreement.

50.    Despite his obligation to do so, H. Patel has failed to make any payments or perform or cause Jigna to perform each obligation required under the Franchise Agreement.

51.    Pursuant to the Guaranty, H. Patel is liable to BFS for Jigna's liquidated damages in the amount of $55,000.00, or actual damages in an amount to be determined at trial, and Jigna's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $71,919.18.

**WHEREFORE**, BFS demands judgment against H. Patel for damages in the amount of all liquidated damages, or actual damages, and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit.

5500712-1

**Connell Foley LLP**
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
        Bryan P. Couch

Dated:  July 13, 2020

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

**Connell Foley LLP**
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
        Bryan P. Couch

Dated:  July 13, 2020

5500712-1

# EXHIBIT A

Location **WEST LEBANON, NH**
Entity No _____
Unit No __18084__

# BAYMONT FRANCHISE SYSTEMS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated __2-6__, 200__6__, is between **BAYMONT FRANCHISE SYSTEMS, INC.**, a Delaware corporation ("we", "our" or "us"), and **JIGNA, LLC**, a __NH__ limited liability company ("you") The definitions of capitalized terms are found in Appendix A In consideration of the following mutual promises, the parties agree as follows

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Baymont System" for providing transient guest lodging services We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination The License is effective only at the Location and may not be transferred or relocated You will call the Facility a BAYMONT Inn & Suites You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term

**2. Protected Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility in the "Protected Territory", defined in Appendix A, while this Agreement is in effect We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed The Protected Territory fairly represents the Facility's trading area, and you acknowledge that there are no express or implied territorial rights or agreements between the parties except as stated in this Section

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are

3 1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with Schedule B and System Standards You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date You must begin renovation of the Facility no later than 60 days after the Effective Date The deadline

1

for completing the pre-opening phase of conversion and renovation, when the Facility must score 125 or fewer points (or equivalent score under a successor quality assurance scoring system we employ), points under our quality assurance inspection system and be ready to open for business under the System, is 120 days after the Effective Date **We shall automatically grant you a sixty (60) day extension, provided you give us 30 days prior written notice.** All renovations will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement Your general contractor or you must carry the insurance required under this Agreement during renovation You must complete the opening renovation specified on the Punch List and the Facility must pass its opening quality assurance inspection with the required score before we consider the Facility to be ready to open under the System We may, in our sole **and reasonable** discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3 3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default Time is of the essence for the Improvement Obligation We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation **INTENTIONALLY DELETED.** The grant of an extension will not waive any other default existing at the time the extension is granted

3 2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3 1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction Any material variation from the Approved Plans requires our prior written approval You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request We may inspect the work, **accompanied by you** while in progress without prior notice **You must make every possible attempt to attend any on site inspection. Notwithstanding the foregoing, we agree that any unfinished Punchlist item, with a completion date later than the Opening Date, will not be counted against the quality assurance score provided that the unfinished Punchlist items are being completed in accordance with the time frame permitted in the Punchlist and are not delinquent.**

3 3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our

2

remedies under Sections 3 1 and 11 2, you will begin paying the Royalty to us, as specified in Section 7 1, from the date you identify or operate the Facility using the Mark   We may delay the Opening Date until you pay the Royalty accruing under this Section ]

3 4  **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards   You will keep the Facility in a clean, neat, and sanitary condition   You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards   The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual   You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay   Your front desk operation, telephone system, parking lot, swimming pool (if any) and other guest service facilities may not be shared with or used by guests of another lodging or housing facility   Unless System Standards permit otherwise, you will not charge guests for local telephone calls made from guest room telephones or charge guests any access fee or surcharge on long distance telephone calls made from guest room telephones   You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is material

3 5  **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4 1 we designate as mandatory for franchisees or general managers, respectively   You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement   You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition and other reasonable charges we may impose for training under Section 4 1   If training is provided at the Facility, you will provide lodging for our representative and rent any equipment and facilities we need

3 6  **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System   You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System   You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants   You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards   You may implement, at your option and expense, your own local advertising   Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication   You will stop using any non-conforming, out-dated or misleading advertising materials if we so request **in writing**

3 6 1  You will participate in any frequent guest rewards program we determine is appropriate and pay the Special Marketing Assessment associated with the program

3 6 2  You must participate in any regional marketing, training or management alliance or

3



cooperative of Chain Lodging franchisees formed to serve the Chain Facilities in your area   We may assist the cooperative collect contributions   You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due

3 6 3  The Facility must participate in our Internet marketing activities for Chain Facilities like other marketing programs   You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website   The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary   You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards   You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with the Chain's Internet marketing activities   You must honor the terms of any participation agreement you sign for Internet marketing   You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory for Chain Facilities, provided that the activities carry aggregate fees of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for Chain Facilities for the preceding calendar year   We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement

3 7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote   You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings   You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224

**3.8  Financial Books & Records; Audits.**

3 8 1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Lodging Association, as modified by this Agreement and System Standards   You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement

3 8 2  We may notify you of a date on which we propose to audit the Facility's books and records   You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date   You need to inform us where the books and records will be produced   You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting

4



periods we require under this Agreement and System Standards  If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3 8 2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4 8 when invoiced  We may also perform an audit of the Facility's books and records without advance notice  Your staff must cooperate with and assist our auditors to perform any audit we conduct

3 8 3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3 8 2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3 8, an "Accounting Procedure Notice "  You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year

3 9  **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement  You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice  The inspections will commence during normal business hours although we may observe Facility operation at any time  You and the Facility staff will cooperate with the inspector performing the inspection  If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection  We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score  We may publish and disclose the results of quality assurance inspections and guest surveys

3 10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual  Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Baymont Franchise Systems, Inc , Cendant Hotel Group, Inc , Cendant Corporation, and their successors and assigns

5

3 11  **Conferences.**  You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain Lodging franchisees, if and when we determine to hold an annual Chain conference   Mandatory recurrent training for franchisees and managers described in Section 4 1 4 may be held at a conference   The fee will be the same for all Chain Facilities that we license in the United States   You will receive reasonable notice of a Chain Lodging conference   You will be charged the fee for each Chain Lodging conference held after the Effective Date of this Agreement

3 12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve   You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards

3 13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Baymont" and its distinguishing characteristics, and the other Marks   You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System You will participate in guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities   You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners

3 14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold, **condition** or delay   You will pay our Rooms Addition Fee then in effect for each guest room you add once the Facility has 200 rooms   If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold, **condition** or delay   You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards

3 15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time

3 16  **Material Renovations.**  Beginning five years after the Opening Date, we may issue a "Material Renovation Notice" to you that will specify a Material Renovation for the Facility, to be commenced no sooner than 90 days after the notice is issued   You will perform the Material Renovations as the Material Renovation Notice requires in a time period of 120 days or by the date specified in the Material Renovation Notice, whichever is longer   We will not issue a Material Renovation Notice within five years after the date of a prior Material Renovation Notice

6

3 17  **Technology Standards & Communications.**  You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment   We may modify System Standards to require new technology at all Chain Facilities

3 17 1 At our request, you shall participate in any intranet or extranet system developed for use in connection with the System   Such intranet or extranet system may be combined with that of our affiliates   You shall also sign such terms of use agreements concerning the use of such intranet or extranet system as we may prescribe, which agreements may contain, among other things (a) confidentiality requirements for materials transmitted via such system, (b) password protocols and other security precautions, (c) grounds and procedures for our suspension or revocation of access to the system by you and others, and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system   You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system

4.  **Our Operating and Service Obligations.**  We will provide you with the following services and assistance

4 1  **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training

4 1 1  **General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program   The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility   We may also offer certain Internet-based training as a supplement to the classroom training experience   Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 45 days after the Opening Date   Any replacement general manager must complete general manager orientation to our satisfaction within 45 days after he/she assumes the position   If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place   Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training   We charge you tuition for general manager orientation which is payable before the scheduled date of the program   The tuition for your first general manager is $1,100   For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program   You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits   We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class   If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 45 day period   We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time

7

period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation   See Section 4 1 5

4 1 2 **Owner Orientation Training.**   We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services   If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date   If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place   Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option   We charge you tuition of $825 which is payable before the scheduled date for the program   You must also pay for your travel, lodging, meal and incidental expenses   If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 60 day period   We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation   See Section 4 1 5

4 1 3 **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service   This training may be offered at our corporate offices, at a regional location, on-line or at the Facility   You must pay the tuition in effect for this program when it is offered to you   If the training is provided at the Facility, you must provide lodging for our trainers   Tuition for remedial training must be paid before the training commences   The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues

4 1 4 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge   This training could be offered in our U S  training center or other locations or held in conjunction with a Chain lodging conference   You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training   We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices   We may also offer Internet-based training via the Chain's intranet website

4 1 5 **No-Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, we may charge you a No-Show Fee equal to 50% of the tuition for the program   If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a Cancellation Fee of up to 100% of the tuition for the program as we establish from time to time   **Notwithstanding the foregoing, you will not have to pay the cancellation fee in the event of a family emergency (i.e., death or hospitalization of an immediate family member (i.e., mother, father, son, daughter or spouse).** No-Show and Cancellation Fees are

8

in addition to the regular tuition which is payable by you for any mandatory training program We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4 1

4 2  **Reservation System.**  We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion  We will use the Basic Reservation Fee included in the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System  The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term  We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties  All information collected or captured by and through the Reservation System, regardless of who enters the information, shall become our sole property

4 3  **Marketing.**

4 3 1  We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of Chain publications and directories of hotels  We will determine in our discretion  (i) The nature and type of media placement, (ii) The allocation (if any) among international, national, regional and local markets, and (iii) The nature and type of advertising copy, other materials and programs  We or an affiliate may be reimbursed from System Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services  We are not obligated to supplement or advance funds available from System franchisees to pay for marketing activities  We do not promise that the Facility or you will benefit directly or proportionately from marketing activities

4 3 2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs

4 3 3  We will publish the Chain Directory  We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication  We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements  We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories

4 4  **Purchasing.**  We may offer optional assistance to you with purchasing items or services used at or in the Facility  Our affiliates may offer this service on our behalf  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards  We may offer optional architectural and design services for the Facility for a separate fee  We or

9



our affiliates may earn a profit from providing purchasing and procurement services, including receipt of fees from third party suppliers

**4 5  The System.** We will control and establish requirements for all aspects of the System  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances

**4 6  Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct We will provide telephone and mail consultation on Facility operation and marketing through our representatives  We will offer you access to any Internet website we may maintain to provide Chain Facility franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement  We may limit or deny access to any such website while you are in default under this Agreement

**4 7  System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications  We will lend you one copy of the System Standards Manual promptly after we sign this Agreement  We will send you any System Standards Manual revisions and/or supplements as and when issued  We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time

**4 8  Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3 8  We may access the reports and data stored in the Facility's property management system provided that we do not unreasonably interfere with the normal functioning of the property management system We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection  We may impose a reinspection fee and will charge you for our costs as provided in Section 3 9  You will pay us an "Audit Fee" of $300 00 when we invoice you for an Audit Fee under Section 3 8  We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500 00, effective any time after December 31, 2005  Our inspections are solely for the purposes of checking compliance with System Standards

**5.  Term.**  The Term begins on the Effective Date and expires at the end of the twentieth License Year  Some of your duties and obligations will survive termination or expiration of this Agreement NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS

**6.  Application and Initial Fees .** You will pay us an Application Fee of $1,000 when you submit your Application  The Application Fee is not refundable  You will pay us an Initial Fee equal to $25,000 when you sign this Agreement  The Initial Fee is not refundable

10

## 7. **Monthly Fees, Taxes and Interest.**

7 1  You will pay us certain Recurring Fees each month of the Term payable in U S dollars (or such other currency as we may direct if the Facility is outside the United States) 10 days after the month in which they accrue, without billing or demand  These fees include the following

7 1 1  A "Royalty" equal to (i) 4% for the first License Year, (ii) 4 5% for the second License Year, and (iii) 5% for every subsequent License Year, of Gross Room Revenues of the Facility accruing during the calendar month, to compensate us for granting you the License and the opportunity to use the System, accrues from the earlier of the Opening Date or the date you begin operating the Facility under a Mark without our consent

7 1 2  "Marketing Fees", including "System Assessment Fees" as stated in Schedule C for advertising, public relations, marketing, training, reservation and other related services and programs, accrues from the Opening Date until the end of the Term, including during periods when reservation service is suspended  After consultation with the official advisory board or committee, if any, and upon 30 days written notice, we may change the System Assessment Fees for all Chain Facilities to cover changes in costs (including reasonable direct and indirect overhead costs) related to such services and programs or to provide for additional services or programs  We may earn a profit on activities supported by the Marketing Fees  You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as travel and other sales agent commissions paid for certain reservations at the Facility plus a reasonable service charge, a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs based on participation and delivery of reservations  We may charge Chain Facilities using the System outside the United States for reservation service using a different formula  We may increase or adjust the Marketing Fees, in the future on not less than 60 days prior written notice, provided that you will not be required to pay more than 6% of Gross Room Revenues for the System Assessment Fees

7 1 3  A "Special Marketing Assessment" as stated in Schedule C for a frequent guest rewards program that we may create or undertake and require participation by all Chain Facilities

7 2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State  You will pay Taxes to us when due

7 3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1 5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid

7 4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility

11

## 8. Indemnifications

8 1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven   You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property

8 2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee   You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest   We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters

8 3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name   You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you   You will cooperate with our defense and resolution of the claim   We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others

## 9. Your Assignments, Transfers and Conveyances.

9 1  **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity)   We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you   You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent   If a Transfer is to occur, the transferee or you must comply with Section 9 3   Your License is subject to termination when the Transfer occurs   The License is not transferable to your transferee, who has no right or

12

authorization to use the System and the Marks when you transfer ownership or possession of the Facility  The transferee may not operate the Facility under the System, and you are responsible for performing the post-Termination obligations in Part 13  You and your owners may, only with our prior written consent and after you comply with Sections 9 3 and 9 6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers

9 2  **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000  Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc  (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9 1

9 3  **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Part 9 until the transferee and you meet certain conditions  If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole **and reasonable** discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection  We will provide a Punch List of improvements we will require after we receive the transferee's Application  We may require structural changes to the Facility if it no longer meets System Standards for entering facilities, or, in the alternative, condition our approval of the Transfer on one or more of the following  limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12 1 at the same rate as you would pay if the termination occurred before the Opening Date  Such payment would be due and payable when you transfer possession of the Facility  We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your Owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise  Our consent to the transaction will not be effective until these conditions are satisfied

9 4  **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee  No Transfer will be deemed to occur  You also must not be in default and you must comply with the application and notice procedures specified in Sections 9 3 and 9 6  Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at

13

our option, execute the Franchise Agreement form then offered prospective franchisees  No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement, **unless the Transferee meets our then-current financial requirements and signs a Guaranty**  You must comply with this Section if you transfer the Facility to a Permitted Transferee  A transfer resulting from a death may occur even if you are in default under this Agreement

9 5  **Attempted Transfers.**  Any transaction requiring our consent under this Part 9 in which our consent is not first obtained shall be void, as between you and us  You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility

9 6  **Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction  You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility  We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days  You will notify us in writing within 30 days after a change in ownership of **50%** or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner  You will provide us with lists of the names, addresses, and ownership percentages of your Owner(s) at our request

**10.  Our Assignments.**  We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent  You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement, but we are responsible for the performance of all of our obligations to you under this Agreement  We may dissolve, terminate and wind up our business under applicable law but we will transfer the System and this Agreement to a party that will perform the franchisor's obligations and that will assume this Agreement in writing  We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement

**11.  Default and Termination.**

11 1  **Default.**  In addition to the matters identified in Section 3 8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement  If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section  We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed  In

14

the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection  Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default  At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default

11 2  **Termination.**  We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11 1, (2) you discontinue operating the Facility as a Chain Facility, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) **INTENTIONALLY DELETED**, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests

11 3  **Casualty and Condemnation.**

11 3 1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty  This restoration will be completed within 180 days **or such other time as we may reasonably agree in our sole discretion** after the Casualty  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13  You will not be obligated to pay Liquidated Damages if the Facility will **not** be used as an extended stay or transient lodging facility **for the first two years** after the Casualty

15

11 3 2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority

11 4   **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement including the failure to observe Technology Standards, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default   All Marketing Fees accrue during the suspension period   Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform   We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration   We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory   We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards   If you default under this Agreement because the Facility fails to meet System Standards, including without limitation failing a quality assurance inspection, we may, at our option and in our sole discretion, require as a condition to your cure of the default that you engage a hotel management company acceptable to us to operate the Facility for a period of at least two years, or longer in our discretion   You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief   We may litigate to collect amounts past due under this Agreement without first issuing a default or termination notice   Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults

11 5   **Your Remedies.**  If we do not issue our approval or consent as and when required under this Agreement, within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent   To the extent permitted by applicable law, this action to compel us to issue our approval or consent shall be your exclusive remedy, and we shall not be liable to you for direct, indirect, special, consequential or exemplary damages, including but not limited to lost profits or revenues

## 12.  Liquidated Damages.

12 1   **Generally.**  If an Involuntary Termination occurs, except as a result of your default under Section 3 1, you will pay us Liquidated Damages within 30 days following the date of termination Liquidated Damages depends on the length of the Term expired and the Facility's Occupancy Rate for the one year period (the "Measurement Period") ending on the last day of the month preceding the effective date of the Involuntary Termination

12 1 1  If the effective date of the Involuntary Termination occurs (a) before the end of the third License Year, or (b) after the end of the third License Year and (i) before the Ending Period

16

defined below, and (11) we are unable to verify your Occupancy Rate as provided below, then you will pay us $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended

12 1 2 If the effective date of the Involuntary Termination occurs after the end of the third License Year, if we are able to verify your Occupancy Rate either through an audit we perform at your expense or by submitting to us within 10 days after the effective date of Involuntary Termination books and records you maintained as required under Section 3 8 and System Standards certified under oath by your chief executive or accounting officers as accurate, then you will pay as Liquidated Damages (1) nothing if the Occupancy Rate was less than 50% during the Measurement Period and you were in full compliance with all of your obligations under this Agreement during the Measurement Period, or (2) the greater of two times the sum of accrued Royalties and System Assessment Fees for the Measurement Period or $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended, if the Occupancy Rate was 50% or more during the Measurement Period or if you were in default of any obligation under this Agreement during the Measurement Period

12 1 3 If the Involuntary Termination occurs during the final two License Years (the "Ending Period"), Liquidated Damages that would be payable under clause 2 of the preceding sentence, or the next preceding sentence, will be limited to the average monthly Royalties and System Assessment Fees during the Measurement Period multiplied by the number of months remaining in the Term

12 1 4 The Occupancy Rate for a period equals the number of guest rooms sold and provided on a complimentary basis divided by the number of guest rooms available for rental to guests Liquidated Damages are paid in place of our claims for lost future Royalties and System Assessment Fees under this Agreement    You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7 3 accruing from 30 days after the date of termination    Our right to receive other amounts due under this Agreement is not affected

12 2    **Condemnation Payments.**    In the event a Condemnation is to occur, you will pay us Royalties and System Assessment Fees for a period of one year (the "Notice Period") after we receive the initial notice of condemnation described in Section 11 3, or until the Condemnation occurs, whichever is longer    You will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the Notice Period if the Condemnation is completed before the Notice Period expires    This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority)    You will pay no Liquidated Damages if the Condemnation is completed after the Notice Period expires, but Recurring Fees must be paid when due until Condemnation is completed

**13.    Your Duties At and After Termination**    When a Termination occurs for any reason whatsoever

17

13 1  **System Usage Ceases.**  You will immediately stop using the System to operate and identify the Facility  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility  You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features   You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces  You will cease all Internet marketing using any Marks to identify the Facility

13 2  **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination  You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a Chain Facility, including the Marketing Fees for so long as the Facility receives service  from  the  Reservation  System    We  may  immediately  remove  the  Facility  from  the Reservation System and divert reservations as authorized in Section 11 4   We may notify third parties that the Facility is no longer associated with the Chain  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10 00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination  You will promptly pay or reimburse us for our cost of removing such items, net of the $10 00 purchase price for signage  We will exercise reasonable care in removing or painting over signage  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage  We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you

13 3  **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions

13 4  **Survival of Certain Provisions.**  Sections 3 8 (as to audits, for 2 years after termination), 3 13,  7 (as to amounts accruing through termination), 8, 11 4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful

**14.  Your Representations and Warranties**    You expressly represent and warrant to us as follows

14 1  **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility   You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility  You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement

18

14 2  **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement   You have obtained all necessary approvals of your Owners, Board of Directors and lenders   No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement   Schedule B accurately reflects your ownership   Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your Owners is a party or is subject or to which the Facility is subject   Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application   You will submit to us the documents about the Facility, you, your Owners and your finances that **reasonably** request in the Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement   To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or are, a terrorist, a "Specially Designated National" or a "Blocked Person" under U S  Executive Order 13224, in lists published by the U S  Department of Treasury's Office of Foreign Assets Control, or otherwise

14 3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your Owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances   There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement

## 15.  Proprietary Rights

15 1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing

15 2  **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit   You acknowledge that System Standards include non-functional trade dress that is an integral part of the System and you covenant that you will not, directly or indirectly through an affiliate, use the trade dress in any structure that is not a Chain Facility   No good will shall attach to any secondary designator that you use

19

**15 3  Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or franchisee), provide services to or joint venture (i) distinctive separate lodging, or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc

**15 4    Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information   Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software)   **Notwithstanding the foregoing, if you are served a subpoena or other governmental or judicial process seeking to compel the disclosure of any Confidential Information, you are to notify us within 72 hours of receipt, thus affording us an opportunity to move to squash the subpoena and/or oppose the entry of any order seeking to compel the disclosure of the Confidential Information.**  You will use Confidential Information only for the Facility and to perform under this Agreement   Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U S  Copyright Act, as amended   Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years   We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information

**15 5  Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware   We alone handle disputes with third parties concerning use of all or any part of the System   You will cooperate with our efforts to resolve these disputes   We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material

20

15 6 **Prior User.** If you are unable to name the Facility with the mark because a pre-existing user has senior rights in your hotel trading area, then your sole and exclusive remedy against us will be to terminate this Agreement and receive a refund of the Initial Fee and the Royalties paid prior to termination  You must give us 15 days prior written notice of termination in that circumstance

15 7 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards   You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent   You will assign to us any such identification at our request without compensation or consideration  You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties   You must participate in the Chain's best available rate on the Internet guarantee or successor program  The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary    You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15 2

## 16. Relationship of Parties

16 1 **Independence.** You are an independent contractor   You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever  We and you have a business relationship based entirely on and circumscribed by this Agreement  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees

16 2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly  The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities

## 17. Legal Matters.

17 1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected  However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party

BAYEXC1
207054 Q2/06

17 2  **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective  We may unilaterally revise Schedule C when this Agreement so permits

17 3  **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below  The parties may also communicate via electronic mail between addresses to be established by notice  You consent to receive electronic mail from us  Notices shall be deemed given on the date delivered or date of attempted delivery, if refused

BAYMONT FRANCHISE SYSTEMS, INC
Our address  1 Sylvan Way, P O  Box 278, Parsippany, New Jersey 07054-0278
Attention  Vice President-Franchise Administration, Fax No  (973) 496-5359

Your name  Jigna, LLC
Your address  ~~440 Bedford STreet, Lexington, MA 02420~~ 45 AIRPORT ROAD WEST LEBANON, NH 03784
Attention  ~~Ashok Patel~~ HARISH PATEL
Your fax No  ~~781-856-8206~~ 603-298-8888

17 4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement

17 5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties  There are no third party beneficiaries  No agreement between us and anyone else is for your benefit  The section headings in this Agreement are for convenience of reference only

17 6  **Choice of Law; Venue; Dispute Resolution.**

17 6 1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey

17 6 2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation  Either party may request mediation through the National Franchise Mediation Program,



using the procedures employed by the CPR Institute for Dispute Resolution, Inc   We will provide you with the contact address for that organization   The mediation will be conducted by a mutually acceptable and neutral third party   If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation

17 6 3   You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you

**17.6.4   WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.6.5**  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action   You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action

**17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1  You received our UFOC for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2   Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4   You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 20 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5   You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

23

17 8  Force Majeure   Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from   (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes, (b) fires, strikes, embargoes, war, or riot, (c) legal restrictions that prohibit or prevent performance, or (d) any other similar event or cause beyond the control of the party affected   Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments

**18.**   **Special Stipulations.**   The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions   You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties   These are personal to you and are not transferable or assignable except to a Permitted Transferee

18 1  Limitation on Audits and Inspections   We agree to limit our audit and quality inspection visits performed at the Facility to no more than five (5) each per each calendar year   Notwithstanding the foregoing, in the event that the Facility fails any quality assurance inspection and/or accounting/bookkeeping/recordkeeping concerns are raised by us during our audit, we may reinspect or re-audit the Facility as many times as necessary until the Facility meets our minimum quality assurance standards and/or our accounting/bookkeeping/recordkeeping concerns are resolved to our reasonable discretion

18 2  **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the fifth or tenth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination   You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination   Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs. (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection   You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent

24

18 3  **Our Additional Termination Right.**  We may terminate the License without cause or penalty effective only on the fifth or tenth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination  You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination  We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent

18 4  **Liquidated Damages.**  Liquidated Damages payable under Section 12 1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000 00) for each guest room of the Facility you are authorized to operate at the time of Termination

18 5  **Special Combined Fees**  Notwithstanding Section 7 1, you will pay the "Combined Fee," consisting of the Royalty and the System Assessment Fee (excluding all Additional Charges such as commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18 5 1  The Combined Fee shall be seven and one half percent (7 5%) of Gross Room Revenues accruing during the first three License Years, and

18 5 2  The Royalty and the System Assessment Fee shall be computed and paid at the rates specified in Section 7 1 on Gross Room Revenues accruing after the third License Year

18 5 3  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200 in a reinspection to be performed not less than 60 days after the initial inspection

25

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above

**WE:**
**BAYMONT FRANCHISE SYSTEMS, INC.**

By _____        Attest _____
       Vice President                                      Assistant Secretary

**YOU, as Franchisee**
**JIGNA, LLC**

By _____        Witness _____
       Manager

25

BAYEXC1
207054 Q2/06

## **APPENDIX A**

## DEFINITIONS

<u>ADA</u> means the Americans with Disabilities Act, as amended, 42 U S C 12101 <u>et</u> seq , and the related Federal regulations, as amended, including the Accessibility Guidelines and Standards for Accessible Design, 28 C F R Part 36, Appendix A

<u>Additional Fees</u> means the fees charged under Section 7 1 2 other than the System Assessment Fee

<u>Agreement</u> means this Franchise Agreement

<u>Application Fee</u> means the fee you pay when you submit your Application under Part 6

<u>Approved Plans</u> means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Part 3

<u>Approved Supplier</u> means a vendor authorized by us to provide proprietary or Mark-bearing items, or whose goods and services are deemed to meet applicable System Standards

<u>Casualty</u> means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control

<u>Chain</u> means the network of Chain Facilities

<u>Chain Facility</u> means a transient lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks

<u>Condemnation</u> means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation

<u>Conference Fee</u> means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held

<u>Confidential Information</u> means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence   Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software

<u>Design Standards</u> mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction

materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other System facilities located outside the United States, Canada and Mexico

Effective Date means the date we insert in the Preamble of this Agreement after we sign it

Elective Termination means termination of the License by valid exercise of the rights under Section 11 3, or your termination of this Agreement or the License if we materially default under this Agreement and fail to cure within a reasonable time after we receive written notice from you specifying the default in detail

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those Owners disclosed on Schedule B, as in effect prior to the transaction  Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner  An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date  An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties constructed at the Location, as modified with our consent

FF&E means furniture, fixtures and equipment

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility

BMTEXC1
203771 2 Q2/06

Gross Room Revenues means gross receipts attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, and the net proceeds of use and occupancy and business interruption, rent loss or similar insurance, to the extent such insurance proceeds are actually received, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment, vending machine receipts, and federal, state and local sales, occupancy and use taxes

Improvement Obligation means your obligation to construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Part 3

Incentive Advance means the amount advanced to you after the Opening Date under Section 6 2, if any

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6 1

Involuntary Termination means a termination of the License under Sections 11 1 or 11 2 or your termination of the License or this Agreement except under Section 18 5 2

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Part 1

License Year means

(i) *If the Opening Date occurs on the first day of a month* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period, or

(ii) *If the Opening Date does not occur on the first day of a month* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period

Liquidated Damages means the amounts payable under Part 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty

Location means the parcel of land situated at 45 Airport Road, West Lebanon, NH 03784, as more fully described in Schedule A

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnities, including guest refunds, or (ii) incurred by any and all Indemnities to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection, and (y) the "Returned Check Fee" we then

68

specify in the System Standards Manual ($20 00 on the Effective Date) if the drawee dishonors any check that you submit to us

<u>Maintenance Standards</u> means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities

<u>Marks</u> means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the names, designs and logos for "BAYMONT" U S Reg No 2,258,085, "BAYMONT    INN", U S Reg No 2,286,567, BAYMONT INN & Design, U S Reg Nos 2,307,473, 2,354,792, 2,383,033, "BAYMONT INN & SUITES" U S Reg No 2,713,336, BAYMONT INN & SUITES & Design, U S Reg Nos 2,399,770, 2,354,791, 2,309,146, and other marks, and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests

<u>Marketing Fees</u> means the System Assessment Fee and the Additional Fees charged under Section 7 1 2 and Schedule C, and the special Marketing Assessment, if any

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere

<u>Material Renovation</u> means the upgrading, updating, modifications, replacements, additions, repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3 16

<u>Material Renovation Notice</u> means the written notice from us to you specifying the Material Renovation to be performed and the dates for commencement and completion given under Section 3 16

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations

<u>Owners</u> means the persons identified on Schedule B as the owners of your Equity Interests

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an Owner any or all of the Owner's Equity Interests upon the death of the Owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor

BMTEXC1
203771 2 Q2/06

Punch List means the list of upgrades, updates, improvements, repairs, repainting, refurbishing and replacements we prepare and require as part of the initial Improvement or Transfer process

Protected Territory means **the area within a circle created by a three mile radius from the front door of the Facility.**

Prototype Plans means the prototype documents reflecting the overall design intent, FF&E, and color schemes for a Chain Facility, that we deliver to you after the Effective Date   The Prototype Plans are not appropriate for a specific Facility

Recurring Fees means the Royalties and Marketing Fees as stated in Part 7

Relicense Fee means the fee your transferee or you pay to us under Part 7 when a Transfer occurs

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4 2

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility

Royalty means the monthly fee you pay to us for use of the System under Section 7 1  "Royalties" means the aggregate of all amounts owed as a Royalty

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C

Special Marketing Assessment means the fee you pay us under Section 7 1 3 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify, which at present includes only the following   (a) the Marks, (b) other intellectual property, including  Confidential Information, System Standards Manual and know-how, (c) marketing, advertising, publicity and other promotional materials and programs, (d) System Standards, (e) training programs and materials, (f) quality assurance inspection and scoring programs  and (g) the Reservation System

System Assessment Fees means the fees charged under Section 7 1 2 and Schedule C for the Chain s marketing  advertising, public relations, Reservation System, training and other services

System Standards means the standards for participating in the Chain and using the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards

Taxes means the amounts payable under Section 7 2 of this Agreement

<u>Technology Standards</u> means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, Internet access, in-room and public area technology, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities

<u>Term</u> means the period of time during which this Agreement shall be in effect, as stated in Section 5

<u>Termination</u> means an Elective Termination or an Involuntary Termination

<u>Transfer</u> means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility   A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction

<u>"You" and "Your"</u> means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees

<u>"We", "Our" and "Us"</u> means and refers to Baymont Franchise Systems, Inc , a Delaware corporation, its successors and assigns

71

## SCHEDULE A

(Legal Description of Facility)

BMTEXC1
203771 2  Q2/06

## WARRANTY DEED

KNOW ALL BY THESE PRESENTS, that We, Les Soloff, individually and as Trustee of the Les Soloff Revocable Trust u/a dated January 30, 1997, and Joan Soloff, individually and as Trustee of the Joan Soloff Revocable Trust u/a dated January 30, 1997, both of the Town of Norwich, County of Windsor and State of Vermont, with a mailing address of Meadowbrook Road, PO Box 746, Norwich, Vermont 05055, for consideration paid, grant to JIGNA, LLC, a New Hampshire limited liability company, of West Lebanon, County of Grafton and State of New Hampshire, with a mailing address of 45 Airport Road, West Lebanon, NH 03784, with WARRANTY COVENANTS, the following described real premises, with all buildings and other improvements thereon, located in the Village of West Lebanon, City of Lebanon, Grafton County, State of New Hampshire, more particularly described as follows

A certain tract or parcel of land shown as Parcel No 3-42 22 on a subdivision plan entitled, "Subdivision Plan of Land in Lebanon, New Hampshire, City of Lebanon - Owner", done in July 1978 by Hoyle, Tanner & Associates, Inc , which plan is recorded in the Grafton County Registry of Deeds as Plan No 172, and to which a more particular description of the premises herein conveyed may be found  The parcel being conveyed is located on the northerly side of Airport Road which leads from Route 12-A to the Lebanon Municipal Airport and is more particularly bounded and described as follows

Beginning at a point where the northerly sideline of Airport Road intersects with the common boundary of Parcel No 3-42 22 herein conveyed and Parcel No 3-42 21 as shown on the above described plan,

Thence North 11° 52' 30" West along the common boundary of Parcel No 3-42 22 herein conveyed and Parcel No 3-42 21, a distance of 625 96 feet to a point marking the northwesterly corner of the premises herein conveyed,

Thence South 87° 48' 16" East along the southerly right-of-way of Interstate I-89, a distance of 179 62 feet to an existing property bound,

Thence continuing South 87° 48' East along the southerly right-of-way of Interstate I-89, a distance of 251 0 feet, to an existing property bound,

1

Thence continuing North 76° 54' 30" East along the southerly right-of-way of Interstate I-89, a distance of 182 34 feet to a point at the northeasterly corner of the premises herein conveyed,

Thence South 11° 52' 30" East along the common boundary of Parcel No 3-42 22 herein conveyed and Parcel No 3-42 23 as shown on said plan, a distance of 425 12 feet to a point at the southeasterly corner of the premises herein conveyed,

Thence South 80° 01' 42" West along the common boundary of Parcel No 3-42 22 herein conveyed and Parcel No 3-42 23, a distance of 368 93 feet to a point,

Thence southwesterly along the arc of a curve having a radius of 85 feet, a distance of 162 02 feet to a point along the northerly sideline of Airport Road (the point arrived at is South 24° 01' 44" East, a distance of 138 58 feet from the previous point, the distance along said arc is incorrectly shown on the above-described plan as being 130 69 feet),

Thence southwesterly along the northerly sideline of Airport Road, a distance of 150 0 feet, more or less, to the point of beginning

Containing 6 64 acres, more or less

See subdivision approval of the Lebanon Planning Board, dated August 14, 1978

All bearings are based on true North

Meaning and intending to describe and convey the same premises described in Quitclaim Deed from Les Soloff to Les Soloff, as Trustee of the Les Soloff Revocable Trust u/a dated January 30, 1997 (a one-half undivided interest), dated May 6, 1997, and recorded in Book 2252, Page 856 of the Grafton County Registry of Deeds, and in Quitclaim Deed from Joan Soloff to Joan Soloff, as Trustee of the Joan Soloff Revocable Trust u/a dated January 30, 1997 (a one-half undivided interest), dated May 6, 1997, and recorded in Book 2252, Page 858 of said Records   Further reference is made to Quitclaim Deed from the City of Lebanon to Les Soloff and Joan Soloff, recorded in Book 1636, Page 500 of the Grafton County Registry of Deeds on December 1, 1986

The Grantors, Les Soloff and Joan Soloff, are a married couple, and the premises herein conveyed do not constitute homestead property of either of them

The above-described premises are conveyed SUBJECT TO the following

1    Avigation easement declared upon the property by the City of Lebanon on February 28, 1979, and recorded in Book 1362, Page 475 of the Grafton County Registry of Deeds,

2    Protective Covenants declared upon the property by the City of Lebanon by

2

## SCHEDULE B

*PART I   YOUR OWNERS*

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|---|---|---|---|
| **Harish Patel** | **100%** | **member** | |

*PART II   THE BAYMONT FACILITY*

Number of approved guest rooms  **56**

[Number of approved suites          ]

Parking facilities (number of spaces, description)  **56**

Other Amenities, services and facilities, subject to changes required by System Standards

    **Meeting Room** with minimum 266 square feet,

    **Business Center** with wireless Internet access, workstation including personal computer and printer

    ~~**Exercise Room** with machines required by System Standards,~~

    **Swimming Pool (optional)**

Electronic lobby and guest room access doors

    Free to guest wired high speed Internet access service and data port telephones in all guest rooms

    Guest room voice mail

    Complimentary continental breakfast

_____
Initial

73

*PART III   DESCRIPTION AND SCHEDULE OF RENOVATIONS*
*TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION*

*(PUNCH LIST TO BE ATTACHED)*

_____
Initial

BMTEXC1
203771 2  Q2/06

NH WEST LEBANON AIRPORT ECONOMY INN CV

Baymont Franchise Systems, Inc
Punchlist for Conversion
"Schedule B Part III"
06/06/2005
Revised on 6/29/2006

**BAYMONT**
INN & SUITES

Page 1 of 6

Tier  Inn & Suites

| OWNER APPLICANT | | ROOM DIMENSIONS - EXISTING | | | | | | GUESTROOMS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Property Name | Airport Economy Inn | # of Rms 52 | 12 | (width) x | 22 | (length) = | 264 00 sq ft | TOTAL ROOMS | 56 | |
| Property Address | 45 Airport Road | # of Rms 4 | 14 | (width) x | 20 | (length) = | 280 00 sq ft | Rentable | 56 | |
| City | West Lebanon  St NH  Zip 03784 | # of Rms | | (width) x | | (length) = | sq ft | | | |
| Conversion Consultant | Jerry James Clarke | # of Rms | | (width) x | | (length) = | sq ft | | | |
| Owner/Applicant | Harish Patel | # of Rms | | (width) x | | (length) = | sq ft | | | |
| Phone | (603) 298-8888 | # of Rms | | (width) x | | (length) = | sq ft | | | |
| Salesperson | Brett Beauchamp | | | | | | | | | |
| Phone | (862) 432-5020 | ROOM DIMENSION STANDARD | | | | | | | | |

### PROPERTY CONDITION SUMMARY

This 19-year-old facility consists of one rectangular-shaped, four-story, interior-corridor building with a stucco facade  The facility will require minor exterior and some interior renovations to comply with System Standards  Landscaping is acceptable and will require no further upgrading at this time

The property is located off of I-89, one mile from Lebanon Municipal Airport (LEB) and 80 miles Northwest of downtown Manchester  The market is mixed between commercial and leisure business  Area competition is limited to the Fireside Inn

| PUBLIC AREA DIMENSIONS - EXISTING | | | | STANDARD | PUBLIC AREA DIMENSIONS - EXISTING | | | | STANDARD |
|---|---|---|---|---|---|---|---|---|---|
| Lobby/Breakfast Area | 36 | (width) x 30 | (length) = 1080 0 sq ft | | | (width) x | (length) = | sq ft | |
| | | (width) x | (length) = sq ft | | | (width) x | (length) = | sq ft | |
| | | (width) x | (length) = sq ft | | | (width) x | (length) = | sq ft | |

### BRAND VARIANCES

**8"x8" ceramic tile is acceptable in the bath areas**

**Property is exempt from the 10 % suites requirement**

**ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST  PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE**

This Punchlist identifies actions needed to cause the Facility to meet the Franchisor s standards  You are solely responsible for compliance of the Facility with applicable federal  state and local laws  codes  ordinances and regulations  You have been provided a Punchlist Reference Guide to assist in compliance with punchlist completion and Brand Standards

This Punchlist was based on a random sample inspection of the Facility on the date specified  You may need to take additional actions to meet our Standards  or comply with law  or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date

Revisions-All Previous Copies are Invalid

6/21/06          ams

flip to

Baymont

**The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application  You should not consider this Punchlist to be final until we sign the License or Franchise Agreement**

Signed _____  Date _____

Print Name  HARISH PATEL



NH WEST LEBANON AIRPORT ECONOMY INN CV

| | EXTERIOR | |
|---|---|---|
| **COMPLETION DATE** | **SCOPE OF WORK** | For Office Use Only |
| Prior to opening | Baymont exterior signs must be obtained from Persona, Inc  Waterton, SD through our sign replacement program  Signs must be leased from our approved leasing program  See your Franchise Agreement Addendum | |
| Prior to opening | Exterior renovation plans must be approved prior to commencement of work through written approval by Design Services at (800) 225-5411 (Option #3)  At a minimum, plans should include roofline modification, Company design accent bands, installation of an approved insulated finish system, etc | |
| Prior to opening | Attach new EIFS accents around columns  Two bands per column one at top of the column and another along the base portion of the column are required  The Exterior Finish System application and color are to be the same as the porte cochere cornice | |
| Prior to opening | Construct a new EIFS cornice along roofline  Attach the new EIFS cornice to existing parapet wall  The exterior Finish System application and color are to be the same as the porte cochere cornice | |
| Prior to opening | Paint roofline parapet directly below the newly constructed cornice beige/tan to match existing facade | |
| Prior to opening | Replace lobby windows where seals are broken<br><br>Replace lobby vestibule door handles | |
| Prior to opening | The porte cochere area is required to be clean and in excellent condition  Required items are a country bench, minimum of two flower pots with plantings year round, a trash can and ash urn | |
| Prior to opening | Swimming pools are required to be equipped with depth markings on the coping and sides of pool  A floating divider rope must also be provided (per local codes), in addition to life preserver's and shepherd's hook  Anti-vortex is required to be used on all swimming pool floors  Pool signage as noted in the Punchlist Reference Guide is | |
| | required  An emergency telephone is required to provide direct access to the front desk at all times  Instructions for use of the phone are required to be posted  It is strongly recommended that the pool phone be programmed directly to 911 | |
| Prior to opening | All outdoor swimming pools are to be fenced and secured with a locking device keyed to the guestroom keycard  If pool is not open year-round, a pool cover per System Standards is required | |
| Prior to opening | Resin type pool furniture in white, neutral or colored finish is required  Arm chairs and chaise lounges are to stack for convenient storage  Refer to the Punchlist Reference Guide for additional information | |
| Prior to opening | Two trash receptacles, artificial silk and floral planters, white wicker etagere for clean towels and wicker hamper with plastic liner for soiled towels per System Standards are required  Refer to the Punchlist Reference Guide for additional specifications | |
| Prior to opening | Replace pool fence  Chain link fencing is not acceptable  Minimum 6FT vertical picket vinyl fencing with EFIS pilasters is required | |
| Prior to opening | Construct a Dumpster enclosure<br><br>Restripe parking lot | |

NH WEST LEBANON AIRPORT ECONOMY INN CV

| | PUBLIC AREAS | |
|---|---|---|
| **COMPLETION DATE** | **SCOPE OF WORK** | For Office Use Only |
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required | |
| Prior to opening | Provide a property management system per System Standards | |
| 90 days after opening | Provide complimentary USA Today® newspapers, Express check-out service, an auto-mated wake-up system, 24-hour front desk, two luggage carts for guest's usage, approved logo'd keycard holders and Valet Laundry service if available | |
| 90 days after opening | Free wireless Internet access in all public areas (lobby, breakfast areas, poolside, meeting rooms, etc ), is required from an approved vendor (i e  Guest Tek, Netopia and SolutionInc ) | |
| Prior to opening | All lobbies, fitness centers and indoor swimming pool areas are to be designated as non-smoking    Properties are required to accept small pets with out charging fees or deposits | |
| Prior to opening | **A small meeting room or multi-purpose room with Murphy bed is required  Refer to the Punchlist Reference Guide for additional requirements** | |
| Prior to opening | A coin-operated washer and dryer with soap dispenser are required on site  (Soap available at front desk is an acceptable option)   Refer to the Punchlist Reference Guide for additional requirements | |
| Prior to opening | A Business Center is required to provide at a minimum copying capability, computer with word processing program, printer fax machine, minimum 2 phones with data ports, free access for 800 numbers, office supplies (i e pens, pads, stapler, etc ) Minimum hours of operation from 8 AM to 8 PM | |
| Prior to opening | Total renovation of the lobby/breakfast area and all corridors per Baymont approved design schemes is required  Contact Design Services/Design and Procurement at (800) 225-5411 (Option #3) for assistance | |
| Prior to opening | Refinish front desk with an upgraded finish  Contact Design Services for assistance prior to commencement of work | |
| Prior to opening | Replacement of stairwell/corridor railings per the National building code, state and local codes and laws, as well as satisfying all criteria listed in the Standards of Operations Manual is required | |
| Prior to opening | Provide a seating area  This area to include carpet, one sofa with cocktail table, 2 chairs and 2 end tables with lamps  The small alcove should have one of two approved scenarios  (1) one lounge chair w/ottoman and side floor lamp or (2) working desk with desk lamp and desk chair | |
| Prior to opening | A 4' - 5' plant should be placed in the corner near the entrance door | |
| Prior to opening | Replace/remove existing lobby Business Center (desk and ergonomic chair)  Contact Design and Procurement for assistance at (800) 225-5411 | |

NH WEST LEBANON AIRPORT ECONOMY INN CV

| PUBLIC AREAS | | |
|---|---|---|
| **COMPLETION DATE** | **SCOPE OF WORK** | For Office Use Only |
| Prior to opening | Remove all miscellaneous wall decor, televisions, water cooler and existing leisure furniture packages | |
| Prior to opening | Provide a complimentary Continental breakfast and area per System Standards  Properties over 80 rooms require a uniformed attendant to service the area  At minimum, breakfast is required to be served 3 hours per day  Recommended hours are 6 a m  - 9 a m  M-F and 7 a m  - 10 a m  Saturday, Sunday and holidays | |
| Prior to opening | Remove existing breakfast counter and all breakfast FF&E from the lobby  The installation of new wallcovering is required | |
| Prior to opening | Install twenty linear feet of cabinets with countertops as per System Standards  Installation of a ceiling/corner mounted 32" flat panel screen television is required | |
| Prior to opening | All breakfast area FF&E should coordinate with a pre-approved Baymont design (carpet, ceramic tile, wall vinyl, window dressing, artwork, seating package, etc )  Contact Design Services and/or Design & Procurement for additional information on approved designs at (800) 225-5411 | |
| Prior to opening | Furnish and install new ceramic tile in renovated breakfast room along breakfast bar and carpet the seating area per System Standards | |
| Prior to opening | All corridor FF&E should coordinate with a pre-approved Baymont corridor design (carpet to include carpet baseboards, wall vinyl, window dressing and public signage to include room numbers)  Contact Design Services and/or Design & Procurement for additional information on approved designs at (800) 225-5411 | |
| Prior to opening | Corridor carpet replacement (to include installation of carpet baseboards) is required, this is to include stairwell entrances (with specified non-skid ceramic tile) and stairwell carpet, to ensure corridors and stairwells coordinate | |
| Prior to opening | Vending area flooring can either be replaced with matching non-skid ceramic tile or corridor carpet  Strongly recommend, at a minimum, the installation of ceramic tile under the vending machines and balance of area in carpet to match the corridors | |
| Prior to opening | Consistent illumination in the corridors is required  Approved lighting treatments are  specified wall sconces or approved ceiling fixtures  Contact Design Services and/or Design & Procurement for additional information on approved designs at (800) 225-5411 | |
| Prior to opening | Ensure existing guest laundry is in compliance with all System Standards as noted in the Punchlist Reference Guide | |
| Prior to opening | Replace guest laundry flooring with a minimum 12' x12' non-skid, ceramic tile | |
| Prior to opening | Replace bin style ice machine with a standing dispensing type unit | |
| | | |

NH WEST LEBANON AIRPORT ECONOMY INN CV

## GUESTROOMS

ROOMS INSPECTED   402, 407, 412, 310, 305, 218, 216, 202, 111, 110, 105

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required | |
| Prior to opening | Provide in-room safes, full-length mirrors, UL trashcans, AM/FM alarm clock radios, coffee makers, irons and full size boards, speaker telephones with 25 FT cord, retractable clothes lines and all required supplies  75% of guestrooms must be designated as "non-smoking" | |
| Prior to opening | Three local channels (ABC, NBC, and CBS), PBS, FOX (if there is a local station), CNN, CNN Headline News, CNN Sport Illustrated, ESPN, ESPN2, ESPN News, CNBC, The Weather Channel, TNT, TBS, USA, Cartoon Network and a free movie channel (either HBO or ShowTime) are required | |
| Prior to opening | Local cable is acceptable if pay per view and a minimum of 40 channels are provided  Properties over 80 guestrooms are required to provide pay-per-view  Properties less than 79 rooms that do not provide pay-per-view are required to provide a second premium channel | |
| Prior to opening | Install secondary U-bar locks with edge guards on all entrance doors on guestroom entrance doors | |
| Prior to opening | Re-adjust self-closures to ensure guestroom entrance doors close properly | |
| Prior to opening | Provide connecting door locks per System Standards  A one way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock are required on all connecting room doors   Operating knobs must be located on room side only with flush plates on inside of doors | |
| Prior to opening | Ensure one-way viewers are installed in all guestroom entrance doors | |
| Prior to opening | Replace smoke detectors per System Standards  Hardwired smoke detectors with a backup system is required  This system may be  battery within the unit or a generator system that is capable of restoring electrical service in case of an outage | |
| Prior to opening | Removal of pamper panels and restoration of all affected wall areas is required | |
| Prior to opening | Removal of all furnishings (i e  casegood package, artwork, light fixtures, recliners, sofas, etc ) is required  Replacement of softgoods (wall vinyl, carpet, drapes and bedspreads) is required  All FF&E and softgoods are required to comply with new Baymont Inn & Suites specifications | |
| Prior to opening | All guestrooms should conform to one of the 3 pre-approved F F & E design packages  Design packages are complete with carpeting, soft goods, bedding, casegoods, seating and lighting  Contact Design Services and/or Design & Procurement for additional information on approved designs at (800) 225-5411 | |
| Prior to opening | Replace existing bedsets (mattresses and boxsprings) with Serta Concierge Emerald or Sealy Posturepedic Plush bedsets per new System Standards | |
| Prior to opening | In the event that microwave/refrigerator units are provided, custom made cabinetry to match new casegood package is required  Contact Design & Procurement Services for assistance at (800) 225-5411 | |

Quality Assurance

Initials ___  PLCRGR

NH WEST LEBANON AIRPORT ECONOMY INN CV

## GUESTROOMS

ROOMS INSPECTED   402, 407, 412, 310, 305, 218, 216, 202, 111, 110, 105

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Provide minimum 27" color and remote operable televisions | |
| Prior to opening | Replace vanity/sink units per Baymont specifications. Cultured marble, solid surface material (Corian or equal), or natural stone with undermount china sink and minimum 8" apron is required. Tissue slot in apron is not acceptable. Cube design tissue holders are required | |
| Prior to opening | Replace vanity lighting with upgraded incandescent fixtures per Baymont specifications. Fixture is required to be wall mounted over the vanity area mirror. Contact Design & Procurement Services at (800) 225-5411 | |
| Prior to opening | Replace vanity mirrors with an upgraded framed design. Contact Design & Procurement Services at (800) 225-5411 for assistance | |
| Prior to opening | Replace towel bars with one towel bar located at the vanity and one towel bar/shelf combination located over the toilet | |
| Prior to opening | Replace ceiling tiles and grids | |
| Prior to opening | Replace plumbing fixtures (tub and sink) where tarnished and/or inoperable | |
| Prior to opening | Install Moen Revolution showerheads, curved shower rods and Hookless® shower curtains of a neutral color in all bath areas | |
| Prior to opening | The installation of illuminated light switches in the vanity areas is required | |
| Prior to opening | Provide hairdryers with nightlights in vanity areas | |
| Prior to opening | Ensure all vanity areas are equipped with GFCI outlets | |
| | | |
| | | |
| | | |

## BAYMONT FRANCHISE SYSTEMS, INC.
## SCHEDULE C
### April 2006

A      System Assessment Fees

The System Assessment Fees consist of the "Marketing Contribution" and the "Basic Reservation Fee" The Marketing Contribution is 1 5% of Gross Room Revenues, the Basic Reservation Fee is 2 0% of Gross Room Revenues We reserve the right to increase or modify the System Assessment Fees (subject to the limit imposed under Section 7 1 2) and any other Additional Fee and to add other Additional Fees as charges for new services, in our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice, to reflect changes in the fully allocated costs of providing Reservation System services, to add, drop or modify the types of reservation and marketing services offered, and to provide the funds reasonably necessary or appropriate for the Chain's marketing, public relations and training programs

B      Additional Fees - GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility The GDS Fee described in Section 7 is $4 50 per reservation processed through any GDS or through any Internet website powered by a GDS Internet-originated reservations carry fees of $3 50 per reservation booked through sources other than GDS powered websites, our Chain website or our direct connection to expedia com or hotels com We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia com or hotels com GDS and Internet-originated reservations may carry a commission if the originator qualifies If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee

C      Additional Fees – Other Marketing and Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of 75% of commissionable revenue Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission

By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service

BMTEXC1
203771 2 Q2/06

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements  Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge  You may collect standard incidental fees, charges and taxes  We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates  Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate  For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms  The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues  We will allocate these commissions to Royalties and System Assessment Fees in equal proportions  Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate  The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program  We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members

D    Special Assessment Fee

We charge a Special Assessment Fee for your participation in the TripRewards® or successor guest loyalty program  Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency  TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards  The Special Assessment Fee is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility  We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check-in  You will be billed monthly in arrears for qualifying stays by program members during the preceding month

E     Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest   If you do not respond to any complaint within 2 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75 00, plus the costs we incur to settle the matter with the guest   In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $25 00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction   We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice   The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages   All guest complaints remain subject to indemnification under this Agreement

77

## **GUARANTY**

To induce Baymont Franchise Systems, Inc its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and the Incentive Advance Note, will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement    Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee   We waive notice of amendment of the Agreement   We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

Witnesses                                                                Guarantors

_____                      _____
                                                                         HARISH PATEL

78

# EXHIBIT B



**BAYMONT**
INN & SUITES

December 29, 2006

Mr. Harish Patel
Jigna, LLC
45 Airport Road
West Lebanon, NH 03784

*Amendment*
*18084 - 80783 -01*

**RE:    Airport Inn to Baymont Inn & Suites #18084 – West Lebanon, NH**

Dear Mr. Patel:

*Congratulations and welcome to our Baymont family!* However brief, it has certainly been my pleasure to work with you towards this opening. Hopefully, we will be working together again on future projects!

Please let this letter serve as official notice that your property is being loaded into our Central Reservations System and will be live and selling in Central Reservations effective today, December 29, 2006. **ALL recurring fees will commence today, December 29, 2006.** You may now install the Baymont Inn & Suites banners that have been shipped to you. I understand that you have been working with Persona for your permanent signage. You may also answer the phone "Baymont Inn & Suites" and display logoed supplies. This letter also confirms a total of 55 <u>rentable guestrooms</u> at this location. One room has been removed from inventory for the breakfast area.

If you haven't already, you will be hearing from Christine Norton, or one of her representatives, of our Property Systems Department regarding your PM System Options. Unfortunately, we won't be able to get your property installed with SoftHotels until summer 2007. You will be required to pay for the system in full once the system is available. To open your property, you will be set up with PRM (internet access to central reservations). The cost for PRM is $500. You have paid for PRM via credit card.

We know you had the choice of many brands and we sincerely appreciate your business. Now that you are a part of the Baymont Inns & Suites family of the Wyndham Hotel Group, we will work very hard on your behalf to ensure that you get off to the right start. At Baymont, we have many innovative marketing, training and reservation programs and strongly encourage you to participate in all of them. We will be loading your property in the Baymont Inns & Suites reservation system and making your property available via the Baymont website. Your property information will then be sent to all the Global Distribution Systems and third party travel sites, such as Travelocity, Orbitz, etc. The turnaround time to be loaded on these external systems is typically 30 to 90 days. Your Integration Services Manager and Franchise Services Manager will keep you updated as to when you will appear live on each of these systems.

Mr. Harish Patel
December 28, 2006
Page two

With the approval of the Brand Executives for Baymont Inns & Suites, your property has been approved to open with work in progress on the punchlist. You will have ninety (90) days to from the opening date to complete the punchlist. A quality assurance inspection will take place on or about March 28, 2007 at which time you must have completed the punchlist (items that were 90 days to complete) and scored a passing entry score. After opening, you will be hearing from Nikhil Mehrotra of our New Property Development Department. Nik will follow-up with you on punchlist completion. Nik can be reached at (973) 753 - 7151. All areas of the property will be graded for appearance in compliance with Baymont Inn & Suites Standards as observed at the time of these inspections.

I will be handing your property file over to Michael Lloyd who is the Director of Franchise Services for Baymont. Tim Glackin is your Franchise Services Manager and will be working with your General Manager on the day-to-day operations as a Baymont Inn & Suites.

Please initial the first page, sign the second page of this letter as your acknowledgment to the above and **return it to me via fax number (973) 753 - 7184.** Please note, by signing this letter, you are also notifying us that you have been authorized to enter into such agreements. This letter, if altered in any way, renders it invalid.

Harish, again, congratulations on your opening; and, I wish you and your staff great success with this site as a Baymont Inn & Suites!

Best wishes,

Matthew J. Hammer
Sr. Manager, Property Openings
New Property Development

SIGNATURE: _____

PRINT NAME: ___Harish Patel___

TITLE/DATE: ___Member  12/29/06___

# EXHIBIT C

Location:   **WEST LEBANON, NH**
Site No.:   18084
Entity No.: 80783 —◯1

### SynXis Subscription Agreement

This SynXis Subscription Agreement ("**Agreement**"), effective as of ___April___   4__, 2015 (the "**Effective Date**"), by and between Baymont Franchise Systems, Inc. - Delaware corporation _____, ("**Franchisor**"), and JIGNA, LLC                                                    ("**Franchisee**"), governs Franchisee's access to and use of the SaaS Solution and Services as described herein. Franchisor and Franchisee shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Agreement.

For and in consideration of the mutual covenants, representations and promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the foregoing and as follows:

1. **GENERAL**

    **1.1   Definitions.**  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement or in any Schedules attached hereto, which may be updated or supplemented by Franchisor from time to time, or as defined in Schedule 1.1.  All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise Agreement and are incorporated herein by reference.

    **1.2   Conflicts in Interpretation.**  The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Schedules attached hereto: (a) first, the terms contained in the body of this Agreement; and (b) second, the terms of the Schedules attached to this Agreement, provided that no order of precedence shall be applied among such Schedules.

2. **DESCRIPTION OF SAAS SOLUTION**

    **2.1   The SaaS Solution.**  The "**SaaS Solution**" means the computer program, applications, features and services expressly identified on Schedule 2.1 and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any Franchisor may from time to time make available to Franchisee.  The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7.

    **2.2   Elavon Hosting Services Agreement.**  In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, Franchisee shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc., or a substantially similar agreement with an alternate vendor designated by Franchisor, ("**Elavon Agreement**").  The Elavon Agreement exclusively covers the offering provided thereunder (the "**Elavon Non-SaaS Solution Services**").

    **2.3   Implementation Services.**  On a date after which Franchisee has signed both the Elavon Agreement and this Agreement, Franchisor shall use reasonable efforts to implement the SaaS Solution as described in Schedule 2.3 attached hereto (the "**Implementation Services**") and Franchisee shall follow all of Franchisor's instructions for preparing the Facility, at Franchisee's sole expense, for implementation of the SaaS Solution.  The SaaS Solution shall be deemed accepted by Franchisee ("**Acceptance**") immediately upon implementation of the SaaS Solution by Franchisor (the "**Acceptance Date**").

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

3.    **GRANT OF RIGHTS**

**3.1    License.**  Subject to payment of all applicable fees, Franchisor hereby grants to Franchisee a limited, non-transferable, non-exclusive license, to access, use and display the SaaS Solution during the Term solely for the Permitted Use and solely by End Users in accordance with the terms and conditions set forth in this Agreement.

**3.2    Limitations.**  Except as provided in Section 3.1, all rights, title and interests in and to the SaaS Solution are reserved to Franchisor or to any Third Party who licenses the SaaS Solution to Franchisor or to Franchisor's Affiliates.

**3.3    Title.**  Title to and ownership of the SaaS Solution, including all Intellectual Property rights therein, is and shall remain with Franchisor, its Affiliates or any Third Party who licenses it to Franchisor.  Franchisee shall at all times protect and defend, at Franchisee's own cost and expense, Franchisor's rights, title and interests in and to the SaaS Solution against all claims, liens and legal processes of Franchisee's creditors.

**3.4    Restrictions.**  Franchisee shall not: (a) permit any unauthorized Third Party to access or use the SaaS Solution; (b) create or attempt to create any derivate works based on the SaaS Solution; (c) copy, frame or mirror any part or content of the SaaS Solution; (d) disassemble, decompile, reverse engineer or otherwise attempt to recreate the SaaS Solution; or (e) access, use or otherwise manipulate the SaaS Solution in order to create a competitive product or service or to copy any features, functions or graphics of the SaaS Solution. Franchisor may, at its sole discretion and without prior notice to Franchisee, conduct audits of Franchisee's Hardware, computer systems and applications, including audits by electronic and remote means, to verify conformance with this Agreement.

**3.5    Suggestions.**  Any suggestions and feedback relating to the SaaS Solution or Services or relating to any desired or recommended additional features, enhancements or modifications to the SaaS Solution or Services that are provided by or through Franchisee or its Affiliates to Franchisor shall be the exclusive property of Franchisor as of the date it is offered to Franchisor and Franchisee and its Affiliates hereby assign all rights and interests in and to such suggestions and feedback to Franchisor as of the date it is offered to Franchisor.

4.    **SERVICES**

**4.1    Additional Services.**  Franchisor may perform additional services agreed to in writing by the parties from time to time, which may include additional fees to be agreed to by the Parties (the "**Additional Services**").

**4.2    Revenue Management Services.**  From time to time, Franchisor may provide services to Franchisee under Franchisor's Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with Schedule 4.2 attached hereto, which may be updated or supplemented by Franchisor from time to time.

**4.3    Maintenance and Support Services.**  Subject to Franchisee performing all Franchisee Responsibilities identified in Schedule 4.3 ("**Franchisee Responsibilities**"), Franchisor shall provide maintenance and support services as set forth on Schedule 4.3 attached hereto ("**Maintenance and Support Services**").

**4.4    Access Credentials.**  Franchisor, directly or indirectly, shall provide Access Credentials to Franchisee. Franchisor may, from time to time and in its sole discretion, change or require Franchisee to change Franchisee's Access Credentials. Franchisee must follow all security procedures and

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

protocols that Franchisor may from time to time establish or modify. Franchisee shall not permit the SaaS Solution to be accessed in violation of the security procedures and protocols as set forth herein. Franchisee shall safeguard any Access Credentials that Franchisor provides to Franchisee as a trade secret, and shall reveal such information only to its End Users on a need to know basis. Franchisee shall immediately inform Franchisor if Franchisee has knowledge or a reasonable basis to believe that its Access Credentials have been lost, stolen, misappropriated or compromised in any way or manner, and Franchisee shall strictly follow Franchisor's instructions regarding any replacement Access Credentials. Franchisee shall be responsible for all access or use through its Access Credentials.

**4.5  Permitted Uses.**  Franchisee shall use the SaaS Solution only for the Permitted Uses with respect to the business and operations of Franchisee as contemplated in the Franchise Agreement. Franchisee shall not load, store or otherwise use any software on or with the SaaS Solution, without Franchisor's prior written consent, as the use of such software may adversely affect the operation and functionality of the SaaS Solution and the Services. If Franchisee violates this Section, the warranties set forth in this Agreement shall be void, and Franchisee shall be solely responsible for the cost of repair or replacement of the SaaS Solution, if any.

**4.6  Franchisor's Responsibilities.**  Franchisor shall: (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for: (i) planned downtime, or (ii) any unavailability caused by circumstances beyond Franchisor's reasonable control, including without limitation, acts of nature, acts of government, floods, fires, earthquakes, civil unrest, acts of terror, labor strikes, Internet service provider failures or delays, or denial of service attacks; and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution.

**4.7  Franchisee's Responsibilities.**  Franchisee shall: (a) be fully responsible for its End Users' compliance with this Agreement; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by Franchisee or its employees, agents or representatives, and for the means by which Franchisee or its employees, agents or representatives acquires Guest Information; (c) prevent unauthorized access to or use of the SaaS Solution, and notify Franchisor promptly of any such unauthorized access or use; and (d) use the SaaS Solution only in accordance with this Agreement and applicable laws and government regulations. Franchisee shall not: (i) make the SaaS Solution available to anyone other than authorized End Users; (ii) sell, resell, rent or lease the SaaS Solution; (iii) use the SaaS Solution to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks.

## 5.  FEES AND PAYMENTS

**5.1  Fees.**  Franchisee shall pay all fee amounts specified in Schedule 5.1 to this Agreement for the SaaS Solution and the Services ("Fees"), for at least the period beginning on the Acceptance Date through the end of the Commitment Period and continuing for the duration of the Term.  If Franchisee's franchise involves the transfer of an existing Chain Facility to Franchisee or changing affiliation of the Facility from one Wyndham Hotel Group-owned franchise system to another, Franchisee will be charged a transfer fee ("**Transfer Fee**"). Franchisee may also request additional training services, which Franchisor may provide to Franchisee for an additional fee. Franchisor may charge an additional fee for services under Section 5.4, if acceleration is at Franchisee's request.

**5.2  Payments.**  Franchisor may apply any amounts received to any outstanding invoices in any order. If Franchisee does not make all payments of Fees to Franchisor when due, then, upon written notice to Franchisee, Franchisor may withhold implementation, suspend the SaaS Solution (subject to

Section 5.4 below) or terminate this Agreement. All amounts due hereunder are due upon receipt of the invoice. Franchisor may increase the ongoing Fees on an annual basis by no more than five percent (5%) above the fees paid by Franchisee during the immediately preceding twelve (12) month period; provided, however, that Franchisor shall notify Franchisee no less than thirty (30) days prior to any such increase taking effect. In the event that a Commitment Period applies, Franchisor will not increase such Fees during the Commitment Period.

**5.3    Overdue Charges.**  If any charges are not received from Franchisee by the due date, then, at Franchisor's sole discretion, (a) such charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid, and/or (b) Franchisor may condition future subscription renewals on payment terms shorter than those specified in Section 5.1 above (Fees).

**5.4    Suspension of Service and Acceleration.**  If any Fees owing by Franchisee under this Agreement for the SaaS Solution and Services is thirty (30) or more days overdue, Franchisor may, without limiting any other rights and remedies it may have, accelerate Franchisee's unpaid fee obligations under this Agreement so that all such obligations become immediately due and payable, and suspend the SaaS Solution and Services to Franchisee until such amounts are paid in full. Franchisor shall give Franchisee at least seven (7) days' prior written notice that Franchisee's account is overdue, in accordance with Section 17.1 (Notices), before suspending the SaaS Solution and Services to Franchisee.

**5.5    Taxes.**  Unless otherwise stated, Franchisor's Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, sales, use or withholding taxes, assessable by any local, state, provincial, federal or foreign jurisdiction (collectively, "Taxes"). Franchisee is responsible for paying all Taxes associated with its purchases hereunder. If Franchisor has the legal obligation to pay or collect Taxes for which Franchisee is responsible under this section, the appropriate amount shall be invoiced to and paid by Franchisee, unless Franchisee provides Franchisor with a valid tax exemption certificate authorized by the appropriate taxing authority. For clarity, Franchisor is solely responsible for taxes assessable based on Franchisor's income, property and employees.

## 6.    TECHNICAL SPECIFICATION REQUIREMENTS

**6.1    Minimum Technical Requirements.**  To access and use the SaaS Solution, Franchisee must use Hardware and subscribe to Communication Services that meet Franchisor's technical specification requirements set forth on Schedule 6.1. If any service provider(s) (including without limitation, any service provider made available by Franchisor), at Franchisee's request, attempts to integrate Hardware with the SaaS Solution or Services, Franchisor shall not be liable for any injury or damage to either the Hardware or the SaaS Solution unless such injury or damage is due to Franchisor's gross negligence or willful misconduct. For the avoidance of doubt, the warranties and support described in this Agreement do not apply to any Hardware or Communication Services.

## 7.    NON-SAAS SOLUTION SERVICES PROVIDERS

**7.1    Acquisition of Non-SaaS Solution Services.**  Franchisor or a Third Party may from time to time make available to Franchisee offerings designed to interoperate with the SaaS Solution ("Non-SaaS Solution Services"). Any acquisition by Franchisee of such Non-SaaS Solution Services, and any exchange of data between Franchisee and any Non-SaaS Solution Services provider, is solely between Franchisee and the Third Party that provides the applicable Non-SaaS Solution Services.

**7.2    No Representation or Warranty.**  Franchisor does not warrant or support any Non-SaaS Solution Services. Any Non-SaaS Solution Services shall be governed exclusively by any agreement entered into between Franchisee and the Third Party that offers the applicable Non-SaaS Solution

Services. If the provider of any Non-SaaS Solution Services ceases to make such Non-SaaS Solution Services available for interoperation with the SaaS Solution on reasonable terms, Franchisor may, in its sole discretion, cease providing access to such Non-SaaS Solution Services without entitling Franchisee to any refund, credit, or other compensation.

## 8. CONFIDENTIALITY

**8.1   Definition of Confidential Information.** As used herein, "**Confidential Information**" means all confidential information disclosed by a Party ("**Disclosing Party**") to the other Party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Franchisor's Confidential Information shall include the SaaS Solution and Services. Confidential Information of each Party shall include the terms and conditions of this Agreement, as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such Party. However, Confidential Information shall not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (b) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (c) is received from a Third Party without breach of any obligation owed to the Disclosing Party; or (d) was independently developed by the Receiving Party.

**8.2   Protection of Confidential Information.** The Receiving Party shall: (a) use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care); (b) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement; and (c) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees, contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein. Neither Party shall disclose the terms of this Agreement to any Third Party other than its Affiliates and their legal counsel and accountants without the other Party's prior written consent.

**8.3   Compelled Disclosure.** The Receiving Party may disclose Confidential Information of the Disclosing Party if it is compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to such Confidential Information.

## 9. DATA PRIVACY

**9.1   Data Policies.** Franchisee shall comply with and abide by Franchisor's data policies and procedures which Franchisor may, at its sole discretion and without prior notice, update from time to time (the "**Data Policies**"). If there is a conflict between the Data Policies and applicable law, Franchisee should comply with applicable law and immediately notify Franchisor in writing of such conflict.

**9.2   Guest Information.** Franchisor and/or its Affiliate shall own all Guest Information that is within the possession of Franchisor and/or Franchisor's Affiliate or any service provider holding such information on Franchisor's or a Franchisor Affiliate's behalf, and Franchisee shall own all Guest Information that is within the possession of Franchisee or any Franchisee service provider holding such information on Franchisee's behalf. To the extent that Franchisor (including its Affiliates) and

Franchisee both possess identical Guest Information, Franchisor's (including its Affiliates') and Franchisee's respective ownership rights with regard to such Guest Information shall be separate and independent from one another. Franchisee acknowledges and agrees that: (a) Franchisee shall take all commercially reasonable steps to assure the timely and accurate collection, recording, processing and transmittal of the Guest Information to the SaaS Solution at all times; and (b) with respect to Franchisee's use of the Guest Information, Franchisee shall comply with all applicable laws, Franchisor's Data Policies and any contract or promise Franchisee makes with or to any of its guests.

**9.3     Non-Owned Information.** Other than the Guest Information, Franchisee shall not use any information it obtains from the SaaS Solution, including but not limited to any information that Franchisor appends to the Guest Information ("**Non-Owned Information**"), for the benefit of any business, enterprise or activity other than the business of the Facility, and in accordance with all applicable laws and Franchisor's Data Policies. Franchisee shall not disclose, copy, assign, transfer, lease, rent, sell, donate, disseminate or otherwise commercialize any Non-Owned Information for any other purpose without Franchisor's prior written consent, which Franchisor may withhold at its sole discretion.

**9.4     Dummy Information.** Any information provided to Franchisee from the SaaS Solution may contain "dummy" information, special codes or other devices to assure compliance with this Agreement and monitor possible unauthorized use of SaaS Solution. Franchisee shall be conclusively presumed to have violated this Agreement if Franchisor discovers any unauthorized mail or contacts from information provided only to Franchisee or the Facility.

**9.5     Improper Access.** If Franchisee should obtain access to Non-Owned Information in violation of the Data Policies or this Agreement, Franchisee shall be a trustee of that information and must act in a fiduciary capacity to protect the information from further unauthorized use or disclosure, and take all commercially reasonable efforts to return the information to Franchisor as soon as possible.

## 10.   WARRANTY AND SUPPORT

**10.1     General.** Franchisor warrants that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that Franchisee: (a) follows Franchisor's instructions, updates and modifications; (b) makes corrections, as directed; (c) pays all applicable Fees when due; and (d) is not otherwise in default under this Agreement or the Franchise Agreement. Franchisor's sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after Franchisee reports such nonperformance to Franchisor.

**10.2     Intellectual Property.** Franchisor has the right to provide Franchisee with the rights granted hereunder, and, to the best of Franchisor's knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party.

**10.3     Support.** Franchisor or its Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and Franchisor or its Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after Franchisee reports such nonperformance to Franchisor. Franchisee must perform all user-required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider.

**10.4     DISCLAIMER.** THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE, IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT FRANCHISOR'S EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THIS AGREEMENT,

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS, OR OTHER EVENTS BEYOND FRANCHISOR'S CONTROL. EXCEPT AS PROVIDED IN THIS SECTION 10, FRANCHISOR MAKES NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY ABOUT THE SAAS SOLUTION OR ANY SERVICES, THEIR MERCHANTABILITY OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE. FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE FACILITY MAY ATTAIN THROUGH THE USE OF THE SAAS SOLUTION OR IN CONNECTION WITH THE RECEIPT OF ANY SERVICES OR THAT FRANCHISEE'S RESERVATIONS OR REVENUE WILL INCREASE. FRANCHISEE, ON BEHALF OF ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES, RELEASES AND RENOUNCES ANY AND ALL CLAIMS OR CAUSES OF ACTION IT MAY HAVE AGAINST FRANCHISOR, FRANCHISOR'S AFFILIATES, OR FRANCHISOR'S OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE SAAS SOLUTION, UNLESS DUE TO FRANCHISOR'S WILLFUL MISCONDUCT.

## 11. INDEMNIFICATION

**11.1 Indemnification.** Franchisee shall indemnify, defend and hold harmless Franchisor, Franchisor's Affiliates, its licensors and their successors and assigns and each of the respective directors, officers and employees associated with them against all claims, actions or proceedings, arising out of or related to Franchisee's operation, use or non-use of the SaaS Solution, including any use of the Guest Information or any Third Party data or system security breaches and any Non-SaaS Solution Services or agreements therefor. Franchisor shall not be liable to Franchisee or any Third Party for personal injury or property loss, including but not limited to, damage to the Facility, as a result of Franchisee's operation, use or non-use of the SaaS Solution, Franchisee's receipt of Services hereunder, and/or any Third Party data or system security breaches or any Non-SaaS Solution Services or agreements therefor. Franchisee is not obligated to indemnify Franchisor for Franchisor's own gross negligence or intentional misconduct arising out of the operation, use or non-use of the SaaS Solution.

## 12. NO LIABILITY FOR INFORMATION

**12.1 No Liability.** FRANCHISOR SHALL NOT BE LIABLE FOR ANY CLAIMS OR DAMAGES RESULTING FROM ANY INCORRECT INFORMATION GIVEN TO FRANCHISOR OR INPUT INTO THE SAAS SOLUTION BY ANY PERSON THAT IS NOT FRANCHISOR. SUPPORT OR SERVICES HEREUNDER NECESSITATED BY COMPUTER VIRUSES, OR BY ANY FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, INCLUDING, WITHOUT LIMITATION, DAMAGE CAUSED BY PERSONS LACKING AUTHORIZED ACCESS, ARE NOT COVERED UNDER THIS AGREEMENT. FRANCHISEE WAIVES ANY CLAIMS HEREUNDER AGAINST FRANCHISOR TO THE EXTENT ARISING FROM FRANCHISEE'S FAILURE TO HAVE OR MAINTAIN CURRENT VIRUS PROTECTION, OR TO THE EXTENT ARISING FROM A FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, OR AS A RESULT OF ANY UNAUTHORIZED ACCESS TO FRANCHISEE'S SYSTEMS.

## 13. DAMAGE LIMITATION

**13.1** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER FRANCHISOR NOR FRANCHISOR'S AFFILIATES SHALL BE LIABLE TO FRANCHISEE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS **"INDIRECT DAMAGES"**) IN

CONNECTION WITH THE SAAS SOLUTION OR THIS AGREEMENT, EVEN IF FRANCHISOR HAD BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE REASONABLY FORESEEN SUCH DAMAGES. IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, FOR DIRECT DAMAGES CAUSED BY FRANCHISOR (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT THE ABOVE LIMITATION IS NOT RECOGNIZED BY A COURT OR OTHER AUTHORITY) ANY CLAIM SHALL BE LIMITED TO THE TOTAL AMOUNT PREVIOUSLY PAID BY FRANCHISEE TO FRANCHISOR FOR THE PREVIOUS TWELVE (12) MONTH PERIOD. THE ABOVE LIMITATIONS ON LIABILITY APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE.

## 14. TERM AND TERMINATION

**14.1 Term.** This Agreement shall be effective as of the Effective Date and shall continue in full force and effect until termination of the Franchise Agreement, unless earlier terminated in accordance with the terms and conditions of this Agreement ("**Term**").

**14.2 Breach.** If any one of the following events occurs, then to the extent permitted by applicable law, Franchisor shall have the right to immediately terminate this Agreement: (a) Franchisee fails to make any payment when due under this Agreement or the Franchise Agreement and such failure continues uncured for a period of thirty (30) days (provided that Franchisor shall provide Franchisee with at least seven (7) days' prior notice of such overdue amount); (b) Franchisee violates the privacy, security or confidentiality obligations set forth in this Agreement; (c) Franchisee breaches any other covenant, warranty or agreement under this Agreement, the Franchise Agreement or any other agreement between Franchisee and Franchisor or Franchisor's Affiliate and such failure continues uncured for a period of thirty (30) days after Franchisee is given written notice of such failure; (d) the SaaS Solution becomes inoperable by Franchisee's act or omission; or (e) Franchisee's Franchise Agreement expires or terminates for any reason.

**14.3 Suspension.** In addition to the right to terminate this Agreement, Franchisor may suspend Franchisee's access to the SaaS Solution upon the occurrence of any of the events described in Section 14.2 until Franchisee's violation is cured and Franchisee has agreed in writing to engage in no conduct that will cause a repeat violation to occur. If Franchisee violates such a restoration agreement, Franchisor may suspend or terminate Franchisee's access to the SaaS Solution permanently or for an indefinite period. Because Franchisor still incurs costs on Franchisee's behalf, Franchisee must continue to pay all fees associated with services under the Franchise Agreement during any such suspension period.

**14.4 Termination For Convenience By Franchisee.** Following the Commitment Period, Franchisee may terminate this Agreement for convenience at any time by providing Franchisor with not less than sixty (60) days' advance written notice.

**14.5 Termination For Convenience By Franchisor.** Franchisor may terminate this Agreement for convenience at any time provided that: (a) Franchisor shall provide Franchisee with no less than six (6) months' advance notice; and (b) if the effective date of such termination occurs during the Commitment Period, Franchisee will not be required to pay for the SaaS Solution and Services that it has not yet used or received for the remainder of the Commitment Period.

**14.6 Upon Termination.** Upon termination of this Agreement: (a) Franchisee's license granted under this Agreement ends and Franchisee shall immediately cease using the SaaS Solution; (b) Franchisee shall immediately cease using the Access Credentials that Franchisee was provided to access and use the SaaS Solution; and (c) Franchisee shall return the originals and all copies of non-owned Guest Information and other Confidential Information unencumbered to Franchisor within thirty (30) days after termination and certify to Franchisor in writing that the original and all copies have been

- 8 -

returned. FRANCHISEE EXPRESSLY WAIVES ANY RIGHT TO NOTICE OF OR ANY HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY FRANCHISOR'S AGENTS OR REPRESENTATIVES OR ANY PREMISES WHERE THE SAAS SOLUTION MAY BE LOCATED AND REMOVING IT WITHOUT JUDICIAL PROCESS. If Franchisee fails or refuses to permit the peaceable entry by Franchisor's agents to take possession of the SaaS Solution, Franchisee shall be liable for rental of the SaaS Solution at the rate of $500.00 per week from the date that Franchisor first attempts to retake the SaaS Solution. Franchisor may, in its sole discretion, embed within the SaaS Solution various security devices that will render the SaaS Solution unusable and the data stored by the Hardware or the SaaS Solution inaccessible if this Agreement terminates.

## 15.   NOTICES

**15.1   General.** All notices and other communications in connection with this Agreement shall be in writing and shall be sent to the respective Parties at the addresses set forth below or to such other addresses as may be designated by each Party in writing from time to time in accordance with this section. All notices and other communications shall be sent by registered or certified air mail, postage prepaid, or by express courier service, service fee prepaid. All notices and other communications shall be deemed received: (a) immediately upon delivery, if hand delivered; (b) five business days after depositing in the mail, if delivered by mail; or (c) the next business day after delivery to express courier service, if delivered by express courier service.

| If to Franchisor: | If to Franchisee: |
|---|---|
| Baymont Franchise Systems, Inc. | JIGNA, LLC |
| 22 Sylvan Way | 45 AIRPORT RD. |
| Parsippany, NJ 07054 | WEST LEBANON, NH, 03784 |
| Attn: SVP, Contracts Administration | |

**With a copy to:**
Wyndham Hotel Group, LLC
22 Sylvan Way
Parsippany, NJ 07054
Attn: General Counsel

## 16.   MISCELLANEOUS

**16.1   Force Majeure.**   If performance by either Party is delayed or prevented (excluding the obligation to make payments under this Agreement) because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or communications systems, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the Party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay.

**16.2   Entire Agreement.**   This Agreement and any attachments hereto, constitutes the entire, final and exclusive agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous statements, representations, negotiations, discussions, understandings and agreements, whether oral or written, with respect to the subject matter of this Agreement.

**16.3   Franchisee's Forms.**   Franchisor is not bound by any terms of Franchisee's purchase order forms or notices of acceptance which attempt to impose any conditions at variance with the terms and conditions of this Agreement or with Franchisor's invoices, standards manuals or technical specifications. Franchisor's failure to object to any provision contained in Franchisee's printed form is

not a waiver of any provision of this Agreement.

**16.4   No Third Party Beneficiary.**   The Agreement is intended for the sole benefit and protection of the named Parties, their successors and permitted assigns, and no Third Party shall have any cause of action or right to payments made or received herein except for any owners of any software who have licensed or authorized Franchisor to sublicense the same to Franchisee.

**16.5   Prevailing Party Attorneys' Fees.**   In the event of an alleged breach of this Agreement, the prevailing Party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom.   For purposes of this Section, the determination of which Party is to be considered the prevailing Party shall be decided by the court of competent jurisdiction that resolves such dispute, claim or litigation.

**16.6   Other Relief.**   Franchisor may obtain the remedy of injunctive relief without the posting of a bond if Franchisee violates its obligations regarding confidentiality, non-disclosure, transfer or limitations on the SaaS Solution use under this Agreement.   Notwithstanding anything contained in this Agreement to the contrary, each Party shall be entitled to seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction.

**16.7   Modifications.**   This Agreement may not be amended, modified or rescinded except in writing, signed by both Parties, and any attempt to do so shall be void and of no effect.   This Agreement may be modified or amended only pursuant to a separate writing mutually agreed upon and signed by both Parties.   The Parties expressly disclaim the right to claim the enforceability or effectiveness of: (a) any oral modifications to this Agreement; and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory.   The Parties expressly disclaim the right to enforce any rule of law that is contrary to the terms of this Section.

**16.8   Governing Law; Exclusive Jurisdiction.**   The validity, construction and performance of this Agreement, and the legal relations among and any disputes between the Parties to this Agreement, shall be governed by and construed in accordance with the laws of the State of New Jersey, excluding that body of law applicable to conflicts of law that would apply the substantive law of another jurisdiction. Any suit or proceeding relating to this Agreement shall be brought only in the state and federal courts located in the State of New Jersey. The Parties hereby expressly consent to the exclusive personal jurisdiction of the New Jersey state courts situated in Morris County, New Jersey, and the United States District Court for the District of New Jersey. Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue with respect to any suit or proceeding brought under this Agreement.

**16.9   Waiver.**   If either Party fails to exercise any right or option at any time under this Agreement, such failure will not be deemed a waiver of the exercise of such right or option at any other time or the waiver of a different right or option. Termination of this Agreement by either Party will not waive Franchisee's obligation to make any payments to Franchisor under this Agreement.

**16.10 Headings.**   The division of this Agreement into sections and the use of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "Agreement," "herein," "hereof," "hereunder" and similar expressions refer to this Agreement and not to any particular section or other portion hereof and include any Schedules or agreements supplemental hereto. Unless something in the subject matter or context is inconsistent therewith, references herein to sections are to sections of this Agreement.

**16.11 No Construction Against Drafter.**   The Parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the

event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

**16.12 Counterparts.** This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

**16.13 Severability.** If any provision of this Agreement is determined to be void or unenforceable, the provision shall be deemed severed from the Agreement and the remainder of this Agreement shall continue in full force and effect.

**16.14 Successors and Assigns.** This Agreement shall inure to the benefit of and be binding upon the Parties, their successors and permitted assigns. Notwithstanding the above, Franchisee may not assign this Agreement without Franchisor's express written consent.

**16.15 Mediation.** The Parties agree that all disputes arising under this Agreement or associated with the SaaS Solution may be submitted to non-binding mediation under the National Franchise Mediation Program supervised by the Center for Public Resources (CPR) Institute for Dispute Resolution, 366 Madison Ave., New York, NY 10017; email: info@cpradr.org.

**16.16 Survival.** The provisions of this Agreement that due to their content should have continuing life shall survive the termination of this Agreement.

**16.17 Treatment of Prior Agreements.** In the event Franchisee has an existing WynGuest Agreement ("**Existing Agreement**") or Beta Test Program Agreement ("**Beta Agreement**") with Franchisor or one of Franchisor's Affiliates, such Existing Agreement or Beta Agreement shall automatically terminate on the Acceptance Date. The subject matter of any Existing Agreement or Beta Agreement, including any rights and obligations thereunder, shall be subject to and exclusively governed by such Existing Agreement or Beta Agreement. No provision, term, condition, right or obligation contained in any Existing Agreement or Beta Agreement, regardless of whether such provision, term, condition, right or obligation survives the termination of such Existing Agreement or Beta Agreement, shall apply to or otherwise affect this Agreement or the subject matter hereof.

**16.18 Release of All Claims by Franchisee.** Franchisee, for itself and its Affiliates, hereby irrevocably releases and forever discharges Franchisor and its Affiliates of and from any and all claims, causes of action or damages, whether legal or equitable, arising from or under or related to its Existing Agreement or Beta Agreement, if any, with Franchisor or its Affiliates. Franchisee shall indemnify, defend and hold harmless Franchisor and its Affiliates from and against any claims or causes of action made against Franchisor or its Affiliates by Franchisee, its Affiliates or any Third Party which arise under or relate to its Existing Agreement or Beta Agreement, if any. Franchisee acknowledges, understands and agrees that the foregoing release is expressly intended to cover and include, without limitation, all claims, past or present, known or unknown, suspected or unsuspected, accrued or unaccrued, asserted or unasserted, which can or may ever be asserted by assignees, successors or otherwise, as the result of the matters herein released, or the effects or consequences thereof based upon acts or omissions from the beginning of time through the Acceptance Date. Franchisee hereby irrevocably and forever waives all rights it may have arising under any statute or common law principle with respect to a general release of unknown or unsuspected claims, causes of action or damages, and Franchisee agrees to expressly waive any rights it may have under any such statute or common law principle.

*[Signature Page Follows]*

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Agreement as of the Effective Date.

**Franchisor**

By: _Michael Piccola_
    62CC98F453C8404...

Name:  Michael Piccola

Title:  Senior Vice President, Contracts Administration

**Franchisee**

By: _Harish Patel_
    D353A507E530459...

Name:  Harish Patel

Title:  (Vice) President / Managing Member / Authorized Signatory

## SCHEDULE 1.1

### Definitions

**"Access Credentials"** means any user name, identification number, password, license or security key, security token, PIN or other security code, method, technology or device used, alone or in combination, to verify End Users' identity and authorization to access and use the SaaS Solution.

**"Affiliate"** means any and all subsidiaries, affiliates, corporations, limited liability companies, partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediaries) control, are controlled by, or are under common control with, the subject entity (with respect to Franchisor, including Franchisor's parent company, Wyndham Worldwide Corporation) and/or such entities.

**"Commitment Period"** means the Commitment Period identified in the Existing Agreement (if applicable), or if no Existing Agreement exists, five (5) years following the Acceptance Date.

**"Communication Services"** means the Internet connectivity services Franchisee uses for purposes of accessing and using the SaaS Solution.

**"End User"** means a person who is authorized by Franchisor, or who is otherwise permitted under this Agreement, to access and use the SaaS Solution, including without limitation, Franchisee.

**"Facility"** means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the effective date of the Franchisee Agreement.

**"Franchise Agreement"** means the License or Franchise Agreement between Franchisee and Franchisor granting to Franchisee the non-exclusive right to operate the Facility under the System.

**"Guest Information"** means any names, e-mail addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including, without limitation, stay information, that either Franchisor or Franchisee or a person acting on behalf of one or both of them receives from or on behalf of the other or any guest or customer of the Facility or any other Third Party.

**"Hardware"** means the computer hardware, peripheral equipment, ancillary equipment, the operating system software and related documentation that Franchisee uses for purposes of accessing and using the SaaS Solution.

**"Intellectual Property"** means any and all rights existing from time to time under patent law, copyright law, trademark law, trade secret law, and any other proprietary rights laws and regulations as well as any related applications, reissuances, continuations, continuations-in-part, divisionals, renewals, extensions, and restorations thereof, now or hereafter in force and effect anywhere in the world.

**"Permitted Use"** means use of the SaaS Solution by End Users for the benefit of Franchisee solely in or for Franchisee's business operations as contemplated for and in accordance with the Franchise Agreement.

**"Services"** shall mean Additional Services, CRISP Services and Maintenance and Support Services.

**"System"** means the comprehensive system for providing guest lodging facility services under the Marks as Franchisor specifies which, at present, includes only the following: (a) the Marks; (b) other intellectual property including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity, and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

**"Third Party"** means persons and entities other than Franchisor and Franchisee.

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

"**WynGuest Agreement**" means an agreement between Franchisor and certain franchisees which governs such franchisees' access to and use of the WynGuest property management system.

## SCHEDULE 2.1

### The SaaS Solution

The SaaS Solution means the SynXis Property Management System, which as of the Effective Date includes the following features and functionality:

- Web-based solution, which may include a local smart client
- Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof
- Beginning 60-90 days from the Acceptance Date, interface with Infor's EzLITE automated revenue management system, which analyzes all PMS data to create property-specific, unconstrained demand models
  - The EzLITE system will offer daily recommendations regarding Best Available Rate ("BAR") and stay control.
    - Recommendations are based on 6 BAR rates entered by Franchisee.
    - Franchisee must accept or override recommendations daily between specified hours, otherwise recommendations will be automatically uploaded into the SynXis Property Management System.
- In-system training materials

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

## SCHEDULE 2.3

### Implementation Services

Franchisor will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following:

- Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)
- Installation of SaaS Solution for Facility's front desk (Hardware to be provided by Franchisee)
- Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials
- Remote and optional on-site resources including training of Facility's staff

SCHEDULE 2.3

## SCHEDULE 4.2

### CRISP Services

**Terms of CRISP Services**

Franchisee agrees to establish the best available rate "**BAR**"; provided, however that Franchisee acknowledges and agrees that it will retain ultimate control over all revenue management decisions. Subject to the foregoing, Franchisee explicitly authorizes Franchisor to make adjustments to the Facility's rates, inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee. Franchisor shall not, however, change the BAR without authorization from Franchisee. In addition, Franchisee may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices. Franchisee's general manager shall be its primary representative who shall have the authority to make revenue management decisions for the Facility, unless Franchisee designates another Facility representative in writing to Franchisor. Franchisor may communicate with Franchisee's representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith, is from Franchisee's representative. Any know-how, algorithms, formulae, data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee in connection with the CRISP Services shall be deemed "Confidential Information" as defined in the Franchise Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise Agreement.

**Overview of CRISP Services**

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by:
- Verifying that all required rate plans are loaded correctly in the SaaS Solution;
- Verifying that local rates are available for sale in the distribution channels selected by the Facility;
- Verifying that all brand standard rate plans are available for sale; and
- Verifying that all hotel specific data is accurate and up to date in all systems.

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels. Key services include:
- Monitoring Facility inventory and rate settings in the SaaS Solution;
- Identifying and advising Franchisee of erroneous rate plans;
- Monitoring rates across distribution channels and checking for accuracy in third party channels; and
- Coordinating participation in key corporate accounts and marketing programs.

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

## SCHEDULE 4.3

### Maintenance and Support Services

#### First Level of Support

Franchisor will provide first-level support for the SaaS Solution, which shall include:

- SynXis Property Management System;
- Infor's EzLITZE automated revenue management system; and
- Any additional interfaces included in the SaaS Solution.

Additionally, Franchisor shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement.

#### Second Level of Support

In the event first level support fails to resolve any maintenance or support issues for the SaaS Solution, Franchisor will provide second level support by putting Franchisee in contact with the appropriate Third Party provider of the SaaS Solution.

#### Franchisee Obligations

Franchisee shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider.

## SCHEDULE 5.1

### Fees

| | |
|---|---|
| **With up to Three Interfaces*** | $565 per month** |
| **One-Time Start-Up Fee** | $1,400** |
| **One-Time Transfer Fee (if applicable)** | $500 |

\* "**Interface**" means any interface you may choose to include, which may be necessary for features relating to, for example, voicemail, call accounting, etc. The Elavon tokenized credit card interface and Infor EzLITE interface are included in the monthly price listed above.

** Franchisees with Existing Agreements shall pay modified Fees as follows:

(1)       the One-Time Start-Up Fee shall not apply; and

(2)       (a)      Franchisees with an Existing Master Subscription Agreement or an Existing WynGuest Agreement – Subscription Model shall pay the monthly fee paid under the Existing Agreement in the month immediately preceding the month in which the Acceptance Date occurs through the second anniversary of the Acceptance Date; or

(b)      Franchisees with an Existing Software and Services Agreements or an Existing WynGuest Agreement – Upfront Model shall pay the monthly fee paid under the Existing Agreement in the month immediately preceding the month in which the Acceptance Date occurs through the later of:

          (i)      the second anniversary of the Acceptance Date; or

          (ii)     the fourth anniversary of the Acceptance Date under the Existing Agreement.

For the avoidance of doubt, the type of Existing Agreement, amount of Existing Monthly Fee, and Acceptance Date of Existing Agreement that shall be applicable to this Agreement are set forth in the chart below.

| Existing Agreement | Existing Monthly Fee | Acceptance Date of Existing Agreement |
|---|---|---|
| WG Up Front | 160.82 | 7/22/2007 |

DocuSign Envelope ID: 4BB8C279-3507-4104-A39A-E3BFBA60E06E

## SCHEDULE 6.1

### Minimum Technical Specification Requirements

1. Windows 7 or higher

2. 4GB+ of RAM

3. 2GHz processor (32 or 64 bit) or greater

4. 1GB+ Available Disk Space

5. The Microsoft .NET Framework Version 4.0

6. Internet Explorer 9 or Firefox 4.0 must be set as the default browser on the SaaS Solution

7. Screen resolution should be set to at least 1024x768

8. To save/view reports Acrobat 9 or higher is required (or compatible pdf reader)

9. Elavon Fusebox connectivity from two way interface

10. Elavon imaged Ingenico Swipe devices with outbound access to Fusebox

11. Elavon Webapp access (manual processing pop-up window)

# EXHIBIT D

# **GUARANTY**

To induce Baymont Franchise Systems, Inc its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and the Incentive Advance Note, will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement   Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee   We waive notice of amendment of the Agreement   We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

Witnesses                                                    Guarantors

_____                    _____
                                                             HARISH PATEL

BMTEXC1
203771 2 Q2/06

# EXHIBIT E

# WYNDHAM

## HOTELS & RESORTS

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445

December 20, 2019

**VIA 2 DAY DELIVERY METHOD**

Mr. Ashok Patel
Jamsan Hotel Management Inc.
440 Bedford Street
Lexington, MA 02420

RE:   **ACKNOWLEDGMENT OF TERMINATION** of the Franchise Agreement for Baymont® by
Wyndham System Unit #18084-80783-01 located in West Lebanon, NH (the "Facility")

Dear Mr. Patel:

Baymont Franchise Systems, Inc. ("we" or "us") has received information on November 25, 2019, (the "Termination Date"), advising us that Jigna, LLC, ("you" or "your") intended to stop operating the Facility as a Baymont facility. We have also since verified that the Facility is bookable as a Best Western hotel on Best Western's website. Accordingly, we acknowledge that the Franchise Agreement, dated July 6, 2006 (the "Agreement") has terminated on the Termination Date.

The Agreement requires you to perform certain post-termination obligations. In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, you must (a) remove all signage and other items bearing the Baymont Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Baymont facility; and (d) remove the Baymont Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines. You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified. You must immediately return to us all training documents, operating manuals and other proprietary material.

Because the Agreement has terminated, you must pay us Liquidated Damages of $55,000.00, as specified in Section 18.4 of the Agreement. You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility. We estimate that, as of the Termination Date, you owe us $67,068.69 in such fees and charges. Please pay us this amount within fourteen (14) days. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantor.

Please know that, because the Agreement has terminated, you have also lost the right to continue to use the seamless interface version of your property management system. You must make arrangements with the software vendor for a new license to use the property management system. Please be advised that due to the termination you will have no functionality from the system. If you wish to continue using an independent version of the SynXis software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 855-849-3487 to obtain reporting of that data.

        

         

Mr. Ashok Patel
December 20, 2019
Page Two


Should you have any questions regarding this matter, please contact Joan Jarrett, Settlements Coordinator at (973) 753-7788.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:    Harish Patel (Guarantor)
       David Unger
       Joan Jarrett
       Michael Piccola
       Joe Maida

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following immediately:**

1. Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Baymont Marks.

2. Remove all interior signage that contains Baymont Marks.

3. Change advertising billboards to remove Baymont Marks, including any department of transportation or other highway signage.

4. Stop answering Facility telephone as a Baymont facility.

5. Remove Baymont name and Marks from any domain name, advertising and brochures.

6. Return to us or destroy all confidential operations and training manuals.

7. Remove the Baymont name and Marks from the following items:

   - Guestroom supplies including door signage, ice buckets, cups etc.
   - Bathroom supplies including soap, shampoo, conditioner, etc.
   - Business cards and letterhead
   - Registration cards, folios, guest receipts, including electronic copies
   - Guestroom keys
   - Uniforms and name badges

8. Paint over or remove any distinctive Baymont trade dress, paint schemes or architectural features.

9. Remove Baymont name from the Facility's listing on TripAdvisor or any other online traveler review site.

10. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Baymont facility.

11. We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

# ITEMIZED STATEMENT

Report Date: 20-Dec-2019

| | | | |
|---|---|---|---|
| As of Date (DD-MMM-YYYY) | : | 25-Nov-2019 | |
| Customer No | : | 18084-80783-01-BAY | |
| Category Set | : | | |
| Category Group | : | | |
| Group No | : | | |
| Bankruptcy | : | No Bankruptcy Sites | |
| Disputed | : | No | |
| Finance Charges Included | : | Yes | |



**BAYMONT**
**BY WYNDHAM**

| | | |
|---|---|---|
| Customer No | : | 18084-80783-01-BAY |
| Address | : | 5 HARDY HILL |
| | | ROAD,LEBANON,NH,03766-2012,US |
| As of Date | : | 25-Nov-2019 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| JUN-2019 | 1903129 | 06/13/2019 | GDS & INTERNET BKGS | | 47.75 | 0.00 | 1.77 | 49.52 |
| | 31970225 | 06/24/2019 | Digital PFP | | 15.96 | 0.00 | 0.76 | 16.96 |
| | 44519068 | 06/30/2019 | 5335A-SYNXIS PM SAAS | | 565.00 | 0.00 | 20.35 | 585.35 |
| | 44534522 | 06/30/2019 | Actual-1001A-ROYALTY FEE | | 3,609.67 | 0.00 | 141.90 | 3,753.71 |
| | 44534523 | 06/30/2019 | Actual-1801A-RESERVATION FEE | | 1,443.87 | 0.00 | 74.36 | 1,539.89 |
| | 44534524 | 06/30/2019 | Actual-1201A-MARKETING FEE, | | 1,082.90 | 0.00 | 55.76 | 1,154.90 |
| | 458179 | 06/22/2019 | WR FREE ENROLLMENTS | | -99.32 | 0.00 | 0.00 | -99.32 |
| | 458180 | 06/22/2019 | WYNREWARDS 5% | | 785.66 | 0.00 | 37.71 | 835.15 |
| | 459128 | 06/22/2019 | WYNREWARDS GOFREECR | | -144.01 | 0.00 | 0.00 | -144.01 |
| | TA0903129 | 06/13/2019 | T/A COMMISSIONS | | 48.99 | 0.00 | 1.81 | 50.80 |
| | TC0903129 | 06/13/2019 | T/A COMM SERVICE CHG | | 39.98 | 0.00 | 1.48 | 41.46 |
| | TM0903129 | 06/13/2019 | MEMBER BENEFIT COMM | | 108.51 | 0.00 | 4.02 | 112.53 |
| | TP0903129 | 06/13/2019 | AAA PROGRAM | | 36.67 | 0.00 | 1.63 | 38.30 |
| | TR0903129 | 06/13/2019 | TMC / CONSORTIA | | 7.48 | 0.00 | 0.28 | 7.76 |
| | | | | Sub Total: | 7,549.11 | 0.00 | 341.83 | 7,943.00 |
| JUL-2019 | 107084 | 07/05/2019 | RETRAIN-JUN2019-10 | | 400.00 | 0.00 | 16.60 | 422.60 |
| | 31987109 | 07/29/2019 | GDS CONNECTIVITY FEE | | 354.00 | 0.00 | 10.45 | 369.76 |
| | 31992485 | 07/31/2019 | Digital PFP Billing | | 154.22 | 0.00 | 4.39 | 160.92 |
| | 44545998 | 07/31/2019 | 5335A-SYNXIS PM SAAS | | 565.00 | 0.00 | 20.35 | 593.83 |
| | 44563941 | 07/31/2019 | Actual-1001A-ROYALTY FEE | | 4,799.56 | 0.00 | 172.78 | 5,044.33 |
| | 44563995 | 07/31/2019 | Actual-1801A-RESERVATION FEE | | 1,919.82 | 0.00 | 69.12 | 2,017.74 |
| | 44563996 | 07/31/2019 | Actual-1201A-MARKETING FEE | | 1,439.87 | 0.00 | 51.84 | 1,513.31 |
| | 461241 | 07/30/2019 | WYNREWARDS GOFREECR | | -534.94 | 0.00 | 0.00 | -534.94 |
| | 461301 | 07/30/2019 | WYNREWARDS 5% | | 1,187.98 | 0.00 | 34.45 | 1,240.23 |
| | 461431 | 07/30/2019 | WR FREE ENROLLMENTS | | -76.18 | 0.00 | 0.00 | -76.18 |
| | TA0910915 | 07/15/2019 | T/A COMMISSIONS | | 219.39 | 0.00 | 8.01 | 230.69 |
| | TC0910915 | 07/15/2019 | T/A COMM SERVICE CHG | | 41.70 | 0.00 | 1.53 | 43.86 |
| | TP0910915 | 07/15/2019 | AAA PROGRAM | | 21.42 | 0.00 | 0.94 | 22.68 |
| | TR0910915 | 07/15/2019 | TMC / CONSORTIA | | 13.78 | 0.00 | 0.50 | 14.49 |
| | | | | Sub Total: | 10,505.60 | 0.00 | 390.96 | 11,063.32 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2019 | 107114 | 08/02/2019 | RETRAIN-JUL2019-7 | | 400.00 | 0.00 | 11.00 | 417.00 |
| | 11104115 | 08/07/2019 | GUEST SRVCS TRANSACTION CHARGE | | 195.00 | 0.00 | 4.87 | 202.80 |
| | 11105557 | 08/07/2019 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.29 | 12.00 |
| | 11106591 | 08/14/2019 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 1.24 | 59.80 |
| | 11107047 | 08/14/2019 | GUEST SRVCS TRANSACTION CHARGE | | 195.00 | 0.00 | 4.19 | 202.12 |
| | 32011676 | 08/22/2019 | Digital PFP Billing | | 397.33 | 0.00 | 6.95 | 410.24 |
| | 32017353 | 08/29/2019 | GDS & INTERNET BKGS | | 442.00 | 0.00 | 6.19 | 454.82 |
| | 44575368 | 08/31/2019 | 5335A-SYNXIS PM SAAS | | 565.00 | 0.00 | 11.59 | 585.07 |
| | 44588290 | 08/31/2019 | Actual-1001A-ROYALTY FEE | | 5,002.84 | 0.00 | 102.55 | 5,180.43 |
| | 44588291 | 08/31/2019 | Actual-1801A-RESERVATION FEE | | 2,001.14 | 0.00 | 41.03 | 2,072.19 |
| | 44588292 | 08/31/2019 | Actual-1201A-MARKETING FEE | | 1,500.85 | 0.00 | 30.76 | 1,554.12 |
| | 462343 | 08/22/2019 | WR ENROLLMENT FEE CREDIT | | -59.79 | 0.00 | 0.00 | -59.79 |
| | 462344 | 08/22/2019 | WYNREWARDS 5% | | 1,576.51 | 0.00 | 27.59 | 1,627.75 |
| | 463776 | 08/22/2019 | WR GOFREE REIMBURSEMENT | | -549.19 | 0.00 | 0.00 | -549.19 |
| | TC0918460 | 08/06/2019 | T/A COMM SERVICE CHG | | 18.21 | 0.00 | 0.46 | 18.94 |
| | TM0918460 | 08/06/2019 | MEMBER BENEFIT COMM | | 50.04 | 0.00 | 1.28 | 52.07 |
| | TP0918460 | 08/06/2019 | AAA PROGRAM | | 25.01 | 0.00 | 0.83 | 26.22 |
| | TR0918460 | 08/06/2019 | TMC / CONSORTIA | | 9.76 | 0.00 | 0.25 | 10.16 |
| | | | | **Sub Total:** | **11,838.94** | **0.00** | **251.07** | **12,276.75** |
| | | | | | | | | |
| SEP-2019 | 107246 | 09/09/2019 | RETRAIN-AUG2019-2 | | 400.00 | 0.00 | 3.40 | 409.40 |
| | 107408 | 09/30/2019 | RETRAIN-SEP2019-1 | | 400.00 | 0.00 | 0.00 | 405.20 |
| | 32035575 | 09/27/2019 | Digital PFP Billing | | 490.08 | 0.00 | 0.00 | 497.19 |
| | 32039978 | 09/30/2019 | August 2019 GDS | | 392.00 | 0.00 | 0.00 | 397.10 |
| | 44607369 | 09/30/2019 | 5335A-SYNXIS PM SAAS | | 565.00 | 0.00 | 3.11 | 576.59 |
| | 44621506 | 09/30/2019 | Accrual-1001A-ROYALTY FEE | * | 4,084.60 | 0.00 | 22.36 | 4,147.93 |
| | 44621507 | 09/30/2019 | Accrual-1801A-RESERVATION FEE | * | 1,825.84 | 0.00 | 8.94 | 1,859.17 |
| | 44621508 | 09/30/2019 | Accrual-1201A-MARKETING FEE | * | 1,219.38 | 0.00 | 6.71 | 1,244.38 |
| | 464744 | 09/22/2019 | WR ENROLLMENT FEE CREDIT | | -19.04 | 0.00 | 0.00 | -19.04 |
| | 464745 | 09/22/2019 | WYNREWARDS 5% | | 1,363.85 | 0.00 | 2.73 | 1,387.04 |
| | 465263 | 09/22/2019 | WYNDHAM REWARDS BONUS POINTS | | 10.00 | 0.00 | 0.02 | 10.17 |
| | 465869 | 09/22/2019 | WR GOFREE REIMBURSEMENT | | -406.20 | 0.00 | 0.00 | -406.20 |
| | TA0925886 | 09/05/2019 | T/A COMMISSIONS | | 244.62 | 0.00 | 2.57 | 250.86 |
| | TC0925886 | 09/05/2019 | T/A COMM SERVICE CHG | | 76.33 | 0.00 | 0.80 | 78.27 |
| | TM0925886 | 09/05/2019 | MEMBER BENEFIT COMM | | 53.29 | 0.00 | 0.56 | 54.65 |
| | TP0925886 | 09/05/2019 | AAA PROGRAM | | 76.11 | 0.00 | 1.37 | 78.62 |
| | TR0925886 | 09/05/2019 | TMC / CONSORTIA | | 264.64 | 0.00 | 2.78 | 271.39 |
| | | | | **Sub Total:** | **10,820.50** | **0.00** | **55.35** | **11,042.72** |
| | | | | | | | | |
| OCT-2019 | 32058288 | 10/30/2019 | September 2019 GDS & Connectivity Fee | | 540.00 | 0.00 | 0.00 | 540.00 |
| | 32064754 | 10/30/2019 | Digital PFP Billing | | 216.83 | 0.00 | 0.00 | 216.83 |
| | 44639431 | 10/31/2019 | 5335A-SYNXIS PM SAAS | | 593.25 | 0.00 | 0.00 | 596.22 |
| | 44653411 | 10/31/2019 | Actual-1001A-ROYALTY FEE | | 7,184.84 | 0.00 | 0.00 | 7,220.76 |
| | 44653412 | 10/31/2019 | Actual-1801A-RESERVATION FEE | | 2,873.94 | 0.00 | 0.00 | 2,888.31 |
| | 44653413 | 10/31/2019 | Actual-1201A-MARKETING FEE | | 2,155.45 | 0.00 | 0.00 | 2,166.23 |
| | 467184 | 10/22/2019 | WR GOFREE REIMBURSEMENT | | -1,799.35 | 0.00 | 0.00 | -1,799.35 |
| | 468588 | 10/22/2019 | WR ENROLLMENT FEE CREDIT | | -4.76 | 0.00 | 0.00 | -4.76 |
| | 468589 | 10/22/2019 | WYNREWARDS 5% | | 1,612.31 | 0.00 | 0.00 | 1,815.53 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|----------|-------------|--------------|-------------|---------|---------|------------|-----------------|-------|
| | TA0933547 | 10/02/2019 | T/A COMMISSIONS | | 279.19 | 0.00 | 0.00 | 282.54 |
| | TC0933547 | 10/02/2019 | T/A COMM SERVICE CHG | | 78.56 | 0.00 | 0.00 | 79.50 |
| | TM0933547 | 10/02/2019 | MEMBER BENEFIT COMM | | 138.49 | 0.00 | 0.00 | 140.15 |
| | TP0933547 | 10/02/2019 | AAA PROGRAM | | 36.23 | 0.00 | 0.16 | 36.93 |
| | TR0933547 | 10/02/2019 | TMC / CONSORTIA | | 28.54 | 0.00 | 0.00 | 28.88 |
| | | | | Sub Total: | 13,933.52 | 0.00 | 0.16 | 14,007.77 |
| | | | | | | | | |
| NOV-2019 | 107623 | 11/05/2019 | RETRAIN-OCT2019-0 | | 400.00 | 0.00 | 0.00 | 400.00 |
| | 32069552 | 11/04/2019 | CRS REACTIVATION FEE | | 4,000.00 | 0.00 | 0.00 | 4,012.00 |
| | 32078204 | 11/14/2019 | UR - Jun 2019 NT Audit | | 47.75 | 0.00 | 0.00 | 47.75 |
| | 32078205 | 11/14/2019 | UR - Jun 2019 NT Audit | | 35.81 | 0.00 | 0.00 | 35.81 |
| | 44672403 | 11/30/2019 | 5335A-SYNXIS PM SAAS | | 593.25 | 0.00 | 0.00 | 593.25 |
| | 44688281 | 11/30/2019 | Actual-1001A-ROYALTY FEE | | 2,484.20 | 0.00 | 0.00 | 2,484.19 |
| | 44688282 | 11/30/2019 | Actual-1801A-RESERVATION FEE | | 993.68 | 0.00 | 0.00 | 993.68 |
| | 44688283 | 11/30/2019 | Actual-1201A-MARKETING FEE | | 745.26 | 0.00 | 0.00 | 745.26 |
| | 469138 | 11/22/2019 | WYNREWARDS 5% | | 1,295.16 | 0.00 | 0.00 | 1,295.16 |
| | 469806 | 11/22/2019 | WR GOFREE REIMBURSEMENT | | -596.00 | 0.00 | 0.00 | -596.00 |
| | 470099 | 11/22/2019 | WR ENROLLMENT FEE CREDIT | | -32.41 | 0.00 | 0.00 | -32.41 |
| | TA0941169 | 11/12/2019 | T/A COMMISSIONS | | 315.86 | 0.00 | 0.00 | 315.86 |
| | TC0941169 | 11/12/2019 | T/A COMM SERVICE CHG | | 126.89 | 0.00 | 0.00 | 126.89 |
| | TM0941169 | 11/12/2019 | MEMBER BENEFIT COMM | | 121.20 | 0.00 | 0.00 | 121.20 |
| | TP0941169 | 11/12/2019 | AAA PROGRAM | | 138.93 | 0.00 | 0.00 | 138.93 |
| | TR0941169 | 11/12/2019 | TMC / CONSORTIA | | 53.56 | 0.00 | 0.00 | 53.56 |
| | | | | Sub Total: | 10,723.14 | 0.00 | 0.00 | 10,735.13 |
| | | | | Grand Total: | 65,370.81 | 0.00 | 1,039.37 | 67,068.69 |

Requested By: Kristine Violette

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

 **Shipment Receipt**

Transaction Date: 18 Dec 2019                     Tracking Number:          1Z75V1920292769368

## ① Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Jamsan Hotel Management Inc.<br>Mr. Ashok Patel<br>440 Bedford Street<br>LEXINGTON MA 024201547 | Wyndham - WHR Franchise Admin<br>Kristine Violette<br>22 Sylvan Way<br>Parsippany NJ 07054<br>Telephone:9737537204<br>email:kristine.violette@wyndham.com | Wyndham - WHR Franchise Admin<br>Kristine Violette<br>22 Sylvan Way<br>Parsippany NJ 07054<br>Telephone:9737537204 email:kristine.violette@wyndham.com |

## ② Package Information

|   | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter<br>(Letter billable) | UPS Letter |   | Sender GL Code - 006-1696<br>Sender e-mail - kristine.violette@wyndham.com |

## ③ UPS Shipping Service and Shipping Options

Service:                  UPS 2nd Day Air

⚠ Please note that extremely high volume on December 16 - 18 may add one day in transit for a small number of UPS 2nd Day Air and UPS 3 Day Select shipments. See if you may be affected:
Check for Service Impacts ↗

Shipping Fees Subtotal:       20.42 USD

   Transportation           19.08 USD

   Fuel Surcharge            1.34 USD

## ④ Payment Information

Bill Shipping Charges to:            Shipper's Account 75V192

| Shipping Charges: | 20.42 USD |
|---|---|
| A discount has been applied for this shipment.<br>Negotiated Charges: | 8.26 USD |
| Subtotal Shipping Charges: | 8.26 USD |
| Total Charges: | 8.26 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide ({0}). To speak to a customer service representative, call 1-800-PICK-UPS for domes services and 1-800-782-7892 for international services.